Argued March 27, affirmed May 1, rehearing denied May 29, 1928.

# STATE EX REL. FRANCES BURGHART *v.* EDWARD HASLEBACHER.

## (266 Pac. 900.)

**Bastards—Filiation Proceeding is in Nature of Civil Action, and is Governed by Same Rules of Evidence (Or. L., § 2550).**

1. A filiation proceeding, under Section 2550, Or. L., is in the nature of a civil action, and the *quantum* of evidence necessary to justify a verdict therein is governed by rules applicable to civil actions.

**Bastards — Complainant in Filiation Proceeding Need not Prove Previous Chaste Character or Promise of Marriage, Question Being Fatherhood of Child (Or. L., § 2550).**

2. In filiation proceeding under Section 2550, Or. L., complainant need not prove as a preliminary matter her previous chaste character, or that the act was procured under a promise of marriage, the main question being the fatherhood of the child, and evidence of her character or habits being of value only as they may tend to affect her veracity or the accuracy of her declarations as to the parentage of the child.

**Bastards—Paternity of Child in Filiation Proceeding may be Proved by Circumstances (Or. L., § 2550).**

3. In filiation proceeding, under Section 2550, Or. L., fact that defendant was father of child may be proved by circumstances.

**Bastards — Evidence Corroborating Complainant in Filiation Proceeding Held Sufficient to Justify Verdict Against Defendant (Or. L., § 2550).**

4. In filiation proceeding under Section 2550, Or. L., evidence corroborating complainant's testimony *held* sufficient to justify verdict against defendant.

**Bastards — Failure to Eliminate Statement Relating to Defendant's Drinking Whisky Before Admitting in Evidence Defendant's Letter to Complainant in Filiation Proceeding, if Error, Held Harmless (Or. L., § 2550).**

5. In filiation proceeding under Section 2550, Or. L., admission in evidence of letter from defendant to complainant showing intimacy and confidence existing between parties without first eliminating statement therein relating to defendant's drinking of whisky, if technically error, because of such failure, *held* harmless.

---

1. Civil or criminal nature of bastardy proceedings, see note in 11 Ann. Cas. 316. What is filiation and how established, see note in 56 Am. Dec. 210. See, also, 3 R. C. L. 750.

Witnesses — Permitting Complainant in Filiation Proceeding to Read Her Statements on Preliminary Examination to Explain Alleged Inconsistencies Brought Out by Defendant Held not Error (Or. L., § 2550).

6. Permitting complainant's counsel in filiation proceeding, under Section 2550, Or. L., to read statements made by complainant in testifying at preliminary examination, *held* not error, where defendant had previously read other statements to show inconsistency thereof with her testimony at trial.

Bastards—Introduction, in Filiation Proceeding, of Lantern Slide of Motion Picture Actor to Fix Date of Alleged Intercourse, Held Harmless (Or. L., § 2550).

7. In filiation proceeding, under Section 2550, Or. L., admission in evidence of lantern slide of a moving picture actor with name of the motion picture in which he was showing, and date of presentation at theater, offered on issue whether parties attended theater on date testified by complainant, as that on which beginning of her sexual intercourse with defendant began, *held* harmless to defendant.

Witnesses — Permitting Cross-examination of Defendant's Witness in Filiation Proceeding as to Complainant's Statements Respecting Date of Act Held not Abuse of Discretion (Or. L., § 2550).

8. Permitting cross-examination of witness for defendant in filiation proceeding, under Section 2550, Or. L., as to certain statements made to her by complainant respecting date on which complainant "got into trouble," *held* not abuse of discretion.

Witnesses—Witness Testifying to Part of Conversation may be Cross-examined Respecting Whole Conversation, Extent Thereof Being Largely Within Trial Court's Discretion.

9. Where a witness has been examined as to part of a conversation, the opposite party is entitled to call for the whole conversation so far as it relates to the same matter, and the extent of such cross-examination is largely in the discretion of trial court.

Witnesses — Refusal to Permit Defendant's Recross-examination of Witness Respecting Her Statements as to Improper Conduct by Herself and Complainant With Other Men Held Proper (Or. L., § 2550).

10. In filiation proceeding, under Section 2550, Or. L., refusal to permit defendant to ask witness on recross-examination whether she did not tell defendant's sister that she and complainant had frequently made dates with other men, implying improper conduct, *held* not error, since testimony would have had no substantive value, if witness had answered in affirmative.

Bastards — Conduct of Complainant's Counsel in Challenging Defendant's Counsel to Read All of Complainant's Testimony at Preliminary Hearing, in Filiation Proceeding, Held not to Require Reversal (Or. L., § 2550).

11. Where counsel for defendant in filiation proceeding, under Section 2550, Or. L., had frequently referred during progress of case

9. See 28 R. C. L. 608.

to contradictions between complainant's testimony on the stand and her testimony on preliminary hearing, conduct of complainant's counsel in challenging defendant's counsel to read all of complainant's testimony on preliminary hearing to jury, *held* not such a violation of the proprieties as to require reversal.

**Bastards—Counsel's Statement That, if Defendant in Filiation Proceeding were not Convicted, State Might have to Support Child, Held Improper (Or. L., § 2550).**

12. Statement to jury of complainant's counsel in filiation proceeding, under Section 2550, Or. L., that, if defendant were not convicted, state might have to support the child, *held* improper and in bad taste, and trial court should have rebuked counsel and directed jury to disregard the remark.

**Bastards — Counsel's Statement in Filiation Proceeding, That, if Defendant were not Convicted, State Might have to Support Child, Held not to Require Reversal, in View of Overwhelming Evidence Against Defendant (Or. L., § 2550).**

13. Statement to jury of complainant's counsel in filiation proceeding, under Section 2550, Or. L., that, if defendant were not convicted, state might have to support the child, though improper, *held* not to require reversal, where testimony against defendant was overwhelming.

**Bastards—Instruction as to Corroboration of Complainant in Filiation Proceeding Held Correct (Or. L., § 2550).**

14. Instruction that complainant in filiation proceeding, under Section 2550, Or. L., must be corroborated by testimony of such nature that, when coupled with her previous evidence, it would lead jury to conclusion that defendant is father of child, and that, if there is no corroboration, verdict should be not guilty, notwithstanding jury might believe complainant's testimony, but, if corroborated, and if jury were convinced by preponderance of evidence of truth of material elements of charge to find verdict of guilty, *held* correct, though it would have been clearer, if followed by more technical definition of corroboration.

**Bastards — Instruction That Evidence of Lovemaking Should not be Construed as Showing Improper Motive of Defendant Held Properly Refused as Misleading and Comment on Evidence (Or. L., § 2550).**

15. In filiation proceeding, under Section 2550, Or. L., defendant's requested instruction that evidence showing that parties made love and showed affection for each other should not be construed as showing of any improper motive on defendant's part, since both parties were unmarried, and law presumes their conduct was in good faith, *held* properly refused as misleading and commenting on particular evidence; instruction given that chastity and not unchastity was to be presumed being sufficient.

Appeal and Error, 4 C. J., p. 1006, n. 72, p. 1131, n. 94.
Bastards, 7 C. J., p. 966, n. 48, p. 969, n. 76, p. 989, n. 86, p. 994, n. 53, p. 998, n. 17, p. 1010, n. 96, p. 1011, n. 98.
Trial, 38 Cyc., p. 1602, n. 58.
Witnesses, 40 Cyc., p. 2491, n. 16.

From Marion: PERCY R. KELLY, Judge.

Department 1.

This is a filiation proceeding brought under Section 2550, Or. L., on the relation of Frances Burghart, an unmarried woman, charging the defendant with being the father of an illegitimate child borne by her on the fourth day of June, 1926.

The complaint was filed June 22, 1926, and the defendant entered a plea of not guilty and after a hearing before the Justice Court was held to answer in the Circuit Court for Marion County. The case was tried before a jury which returned a verdict of guilty against said defendant; upon which verdict the defendant was adjudged to pay to the complainant for the use and benefit of said child the sum of $250 per annum following the fourth day of June, 1928, and thereafter the sum of $300 per annum for each and every year during the life of said child until it should attain the age of fourteen years. It is unnecessary to state further particulars of said judgment, which follows the law in all respects. From this judgment defendant appeals. AFFIRMED. REHEARING DENIED.

For appellant there was a brief over the names of *Mr. Walter C. Winslow* and *Mr. C. A. Swope,* with an oral argument by *Mr. Winslow.*

For respondent there was a brief over the names of *Mr. Guy O. Smith, Mr. John Carson,* District Attorney, and *Mr. Lyle J. Page,* Deputy District Attorney, with an oral argument by *Mr. Smith.*

McBRIDE, J.—1. Since the opinion of this court in the case of *State* v. *Newman,* 109 Or. 61 (218 Pac.

936), it is definitely settled in this state that a proceeding of the character of the case at bar is in the nature of a civil action, and, in discussing the *quantum* of evidence necessary to justify a verdict, we shall so treat it.

The complaint in this case charges that the first sexual intercourse between the parties took place on the fourth day of August, 1925, but the defendant testified that in fact the date was September 6, 1925, and that the date August 4th was a mistake. Such a mistake in dates is not unnatural or uncommon and is only of importance as to its relation with the period of gestation.

2. It may be well to say in the outset that, as this is not an action for seduction, it is not necessary that the complainant should as a preliminary matter prove previous chaste character, or that the act was procured under a promise of marriage, although we are of the opinion that both these facts are abundantly shown in an incidental manner by the testimony. The main question here is not the character of the woman, but the fatherhood of the child. Evidence of her character or habits is only of value as they may tend to affect her veracity or the accuracy of her declarations as to the parentage of the child.

3. It would seem proper in this instance to consider first defendant's contention that there is no evidence to corroborate complainant's claim that defendant had sexual intercourse with her. In cases of this character actual ocular evidence, *rem in re,* is rarely or never attainable. The fact must be proved by circumstances. Otherwise, prosecutions for adultery, seduction and bastardy would almost universally fail.

In *State* v. *Wells,* 48 Iowa, 671, 672, which was a criminal action for seduction and in which the circum-

stantial evidence against the defendant was very similar to that adduced in the case at bar, the court said:

"Counsel for appellant claim that there was no sufficient corroboration to justify the verdict. A careful examination of the evidence satisfies us that his objection is not well taken. It is abundantly shown, aside from the testimony of the complaining witnesses, that at the time of the alleged seduction the parties had entered into a marriage engagement. That such a relation existed is conceded. It further appears that she was delivered of a child at the usual time after the alleged intercourse, and that about the time the child was begotten the defendant was a constant visitor at her father's house, where she resided, and was frequently and at stated times alone with her far into the night. In addition to this, it does not appear that at that time she had any other male company. Taking into consideration all these circumstances, we are not prepared to say that the jury were not warranted in finding that corroboration was sufficient. The court, in its fifth instruction to the jury, called attention to these circumstances as proper corroboration, and in this we think there was no error."

And in the case of *State* v. *Painter,* 50 Iowa, 317, 319, which was also a criminal action for seduction, the court said:

"If there were a promise of marriage, the birth of a child, the defendant constant visitor, etc., in addition to opportunity, it would be sufficient, as was held in *State* v. *Wells,* 48 Iowa, 671. The character of the offense is such that other corroborative evidence cannot well be obtained. From necessity it must, therefore, be held sufficient."

While both the above cases were criminal actions, where courts are, if anything, stricter in enforcing the rules requiring corroboration than in civil cases of the character of the one at bar, the rules there enunciated are unquestionably applicable here.

4. The complainant, at the time the alleged sexual act occurred, was an ignorant country girl about eighteen years of age. Her testimony taken about two years later indicates that she had never had many educational advantages and is of barely average mentality. She is the child of foreign-born parents who speak and understand English very imperfectly. She was raised in the country, had only been as far as the eighth grade in school and may be fairly characterized as an ignorant, unsophisticated country girl. So far as it appears, defendant was her first and only beau. At the age above stated, she began working as a domestic in the vicinity of where her sister resided, and shortly after that made the acquaintance of the defendant. From 1923 up to and including a great part of 1925 he was her constant attendant, taking her to parties, shows and functions of that character, visiting her at the home of her parents, writing her letters filled with love, kisses and bad grammar, and generally conducting himself toward her as a most devoted lover. Like an affectionate sweetheart, she treasured and kept his letters. He says he destroyed hers, but judging from the nature of his epistles they were probably of an equally affectionate character. While the defendant now says that she occasionally "stepped out" as he terms it with other men, he was unable to show any instance where she ever went with any other man anywhere, or to procure a witness who had ever known her to do so. She stated that in July, 1924, defendant asked her to be his wife and she consented; that from time to time he kept putting off the wedding day on account of the fact, as he claimed, that he did not have money enough yet; that up to July or August of 1926, they discussed building a home; that driving along he would say: "This is the home we are going

to have, isn't it?'' and that she would say, "Sure it
is.'' That they studied furniture and discussed their
wedding pictures and that he made her presents, a
wrist watch and a string of pearls, both of which were
exhibited at the trial. The evidence of relatives and
associates indicate that they conducted themselves
after the usual manner of engaged sweethearts.
Relatives corroborated her testimony as to his fre-
quent visits and endearments and as to their discuss-
ing houses and furniture.

Complainant testified that defendant promised to
buy her a ring as soon as he got the money, and her
sister, with whom she was staying, testified that on
one occasion he put his arm around complainant and
came up to the witness and held up complainant's
hand and said: "You watch her finger, some time
she is going to have something on there,'' and that
he would take her around the neck and say, "Aren't
we a nice couple—wouldn't she make a nice wife for
me?'' The complainant testified that about the mid-
dle of August, 1925, while the defendant was working
on the threshing crew on the Haselburger place, she
went with him about 9 o'clock in the evening to the
place where the machine was standing and where de-
fendant's blankets, which he slept in, were situated;
that she made up his pallet for him and they both got
under the covers and were in that position when Joe
Rentz, defendant's sleeping partner, and a man by
the name of Martin came up and found them in that
position. Rentz was called as a witness and abso-
lutely corroborated this statement, and so did Martin.
They were friends and associates and fellow-workmen
with defendant and there is no room for doubting
this testimony. Complainant testified that nothing
sexual happened on that occasion and we may well be-

lieve that the sudden and unexpected incursion of his fellow-workmen may have frightened all amorous thoughts that defendant might theretofore have entertained entirely out of his system. But conceding that nothing unlawful happened on that occasion, the circumstances show what a hold defendant had on the affections of this ignorant girl. There is another important aspect in which we view this testimony. The defendant absolutely denied being in bed with complainant, but says that she only was under the covers. and that he was sitting by the side of the bed, and flatly contradicted the complainant and his own fellow-workers, the two other disinterested witnesses. We do not believe his testimony and, if he is false in this, it was the privilege of the jury to disbelieve other denials which he has made in his testimony.

The defendant also claimed that he was in Klamath Falls on September 6th, but the witness, by whom he attempted to prove this, was entirely uncertain about dates and the alibi was a failure in view of other testimony introduced, and particularly that of Mrs. Lorene Matthis, who testified that complainant was staying at her house on September 6th; that about 7:30 in the evening defendant came to the door for complainant and that she went away with him and returned about midnight. She is positive about the date, and, although there was some haggling about her identification of defendant, it fell very flat in the light of her husband's testimony, who positively identified defendant and testified to his presence on the premises on the evening of September 6th.

Richard Tuve, a neighbor of defendant and an acquaintance of twenty years' standing, testified that shortly after this proceeding was commenced and about June, 1926, he had a conversation with defend-

ant in which defendant stated that "he told the girl that he was willing to take her down to Portland to have it knocked." Here, as in the case of the testimony of Rentz and Martin, defendant absolutely denies the conversation.

The complainant testified that after she informed defendant of her condition, he suggested that she go to Portland to an address which he gave her and get rid of the child, and thus we have her testimony corroborated by a disinterested witness, a life-long neighbor and friend of defendant. In fact, the defendant's testimony consists largely in the denials of statements made largely by disinterested witnesses and insinuations against the complainant, which he totally failed to substantiate, and, even if this were a criminal prosecution, no intelligent jury would be likely to hesitate in finding a verdict against him. In the face of the clearly admissible testimony including defendant's admission on cross-examination, that he had twice attempted the virtue of the young woman and had been repulsed, the defendant interposes certain technical objections to the admission of testimony offered and admitted, and to instructions requested by defendant and refused by the court, and these we shall now discuss.

5. The first objection was to the admission of certain words in a letter, written by defendant to complainant in 1923, in which he gives an intimate account of the doiugs at a certain party which he had attended. In this letter occurs the following paragraph:

"Say, last Sunday we had one heck of a time. Sat. night we went to my cousin to a party. All of young related folks were there all the older people went home at 12 o'clock and the rest of us stayed up all night and danced and played cards and drank whiskey

and then Sunday we went to my uncle at Molalla. We went for a deer hunt while we was there and just saw one.''

The defendant's counsel did not object to the letter as a whole, but contends that the phrase ''and drank whiskey'' should be eliminated because it tended to show that defendant had been guilty of another offense and would tend to prejudice him with the jury. The court overruled the objection and admitted the letter as a whole. While the letter, as a whole, tended to show such intimacy and confidence between the parties and that defendant was willing to trust complainant with an account of actions which young men usually keep to themselves, the court should as a matter of prudence have eliminated the phrase, and its failure to do so may have been a technical error, but we have too much confidence in the intelligence of an average jury to assume that they would conclude that because a young man took a drink in 1923 he would be likely to seduce a woman in 1925. The statute requires that the jury panel should be composed of ''the most competent citizens'' and we assume that these were such. We are of the opinion that the error, if any, was harmless in this instance.

6. Another exception taken by defendant is to the action of the court in permitting counsel for complainant to read portions of the testimony of complainant, given on the examination of this case before the justice of the peace, and questioning her thereon. While the bill of exceptions is not clear as to this matter, we gather that counsel for defendant, for the purpose of showing that complainant had made statements on the preliminary examination inconsistent with her testimony at the final trial, had read or quoted statements made at the preliminary hearing

and asked her if such had not been her testimony, and, to explain these apparently inconsistent statements, counsel for complainant read to witness and to the jury excerpts from other parts of her testimony which he contended explained the apparently inconsistent statements and showed that, on the whole, the testimony of the witness in both courts had been substantially the same. We see no substantial error here.

The third exception involves defendant's contention that there was an entire lack of such corroboration of complainant's evidence of the material facts constituting the offense. This we have already carefully considered and discussed.

7. Exception number 4 relates to the admission of a lantern slide containing the picture of Thomas Meighan, a moving picture actor, with the words, "The Man Who Found Himself, Virginia Valli, Booth Tarkington, a paramount picture, here to-morrow, Tuesday-Wednesday." Defendant's counsel objected to the admission of the picture and its relevancy is not apparent. The jury had the pleasure of looking upon the counterfeit presentment of an exceedingly good looking, well-groomed young man and that was all. No damage was done to defendant's case by its introduction.

Counsel for defendant claims that it was not the picture itself, which he objected to, that was prejudicial, but its connection with the complainant's testimony, which in brief was this. Complainant testified that on the evening of September 6, 1925, that being the date she fixes as the beginning of her sexual intercourse with defendant, he took her to a movie show in Salem; that the title of the play was "The Man Across the Way"; that the play contained a story of

a man who got a girl into trouble and then deserted her; that she and defendant talked about the picture on the way home and defendant said, "That wasn't the way for a man to do to go and leave her." She also testified that on her way home he hugged and kissed her, felt of her person and her breasts and finally on their arrival at the barn pulled her over across the seat and accomplished his purpose. How much the conversation about the sinful betrayer had to do with her ruin or to what extent defendant's lascivious caresses contributed thereto does not appear. Defendant called Mr. Collard, then the house manager of the Bligh theater, who testified that the play "The Man Across the Way" was not presented that night but that a show called "The Making of O'Malley" was the feature play; that he was not familiar with all the details but that it related in a general way to the story of a New York policeman and his efforts to clear up a ring of gamblers and such things. The description of the play by the witness is hardly adequate to enable us to determine whether or not a scene such as described by the complainant occurred in it, but it indicates that the title of the play was not "The Man Across the Way" and that no play by that title was produced at the Bligh Theater at or near that date. It was for the jury to determine whether the complainant was, as counsel for defendant contends, making up a story out of whole cloth, or whether she was simply mistaken in the title of the play. The introduction of the photograph was as harmless as the introduction of a picture of President Coolidge would have been.

8. Exception number 5 relates to some questions asked by complainant's counsel, relating to statements

made to her by defendant, and conversations with defendant and one of his counsel. The matter arose thus: The defendant in his testimony had stated that he had been informed that the complainant and Katherine Herschfelt, at the time stated by defendant, having been unmarried, had taken a trip to Mt. Angel in company with two young men, Joe Miller and Mr. Cramer. Mrs. Herschfelt was called as a witness in rebuttal by complainant, and stated emphatically that no such excursion ever took place and reiterated the same statement on cross-examination, stating that she never went with complainant anywhere at all except in town when they went by themselves.

Counsel for defendant then asked permission to make Mrs. Herschfelt defendant's witness and proceeded to examine her substantially as to whether complainant had not told her that she "got into trouble" on the 4th of September instead of the 6th, and the witness answered in substance:

"Well, it was this way she talked to me about it and told me when the baby was born, the date the baby was born, and what date it happened and I got the dates mixed, I said, this was the 4th of September instead of the 6th and the baby was born on the 4th, that is how I got things mixed."

The witness was then asked as to what she had told counsel and what she had stated on the witness-stand on the preliminary examination, which appears to be substantially that she had stated that complainant had told her that she got into trouble on the 4th of September. The witness was very sharply criticised as to what she had told counsel for defendant, who were evidently surprised at the change in her testimony. Counsel for complainant then cross-examined her as to the whole of her conversation with the attorney

and, over the objection of defendant's counsel, she testified as follows:

"Oh well they came there and tooted the horn and I looked out of the window and seen it was Ed and I knew him quite well so I thought I would go out and talk to him, and I went out and he said 'Did you know Frances had a baby' and I says, 'no, did she,' and he says 'yes' and 'they are trying to blame, saying I am the father' and I says, 'well, Ed you have been going with her it looks like you would be the father' and he says, 'well no, he was innocent, he wasn't the father of that baby,' and he asked me if I wouldn't act as his witness, and I said 'no, I didn't see why I would want to go as a witness for anybody,' and he asked me if I ever seen her go with other men, and I says 'no' and things like that. I don't just remember everything he said."

9. Where a witness has been examined as to part of a conversation, the opposite party is entitled to call forth the whole conversation so far as it relates to the same matter. The extent of such cross-examination is largely in the discretion of the court, and we are not prepared to say that such discretion was abused in the present instance.

10. Exception number 6 relates to a ruling of the court upon a question asked Mrs. Herschfelt on re-cross-examination by defendant's counsel. The witness was recalled and asked this question:

"I will ask you if it isn't a fact that while you were staying with Alice, there being present yourself and Alice, you didn't tell Alice about how you folks while you were working at Downings—tell her in substance—you made dates with men and went out with different men, or words to that effect?"

The court sustained an objection to this question and this ruling is assigned as error. The question

was clearly incompetent and immaterial. The witness when first called by the state was interrogated only as to an alleged trip to Mt. Angel and answered only in respect to that. She was then asked on cross-examination the question already detailed and answered this and her cross-examination closed. Counsel for defendant then made her his witness in regard to certain statements alleged to have been made to her by complainant, as heretofore detailed. The complainant's counsel cross-examined her on these and the examination closed. Counsel for defendant then asked leave to recall and cross-examine her further and it was granted with the final result that he asked her the question above stated. The question asked was not relevant to anything testified to by witness on her first examination and was wholly indefinite. In substance, the question is:

"Did you tell defendant's sister Alice that while *you folks* were working at Downings *you* made dates with men and went out lots with different men or words to that effect?"

We are to assume that by "you folks" were meant complainant and the witness and by "you" that complainant was also meant to be included, and also that by "going out" with different men, something improper was to be implied. The ruling of the court was proper, and the testimony would have had no substantive value if the witness had answered in the affirmative.

11, 12. The next exception is as to the conduct of counsel in commenting upon the failure of defendant's counsel to read complainant's testimony on the preliminary hearing to the jury. The statute provides that such testimony must be read if defendant requires it. In the progress of the case, defendant's counsel

had referred frequently to contradictions between complainant's testimony on the stand and that given by her on the preliminary hearing. The challenge to defendant's counsel to read all of that testimony was very much in the nature of what newspapers now call "bunk" but was not such a violation of the proprieties as to call for a reversal of the case. The same applies to another alleged impropriety committed by counsel in saying to the jury, in substance, that if the defendant were not convicted the state might have to support the child. While the consequence predicted might possibly happen, it was improper and in bad taste for counsel to have referred to it, or used it as an argument, and the court should have rebuked counsel and directed the jury to disregard the remark although it is scarcely within the bounds of possibility that an intelligent and honest jury would have been affected by it.

13. Were this a close case, we would be disposed to reverse it even at the expense of a helpless infant, but the testimony introduced by the state is so overwhelming that we do not think that this remark had any effect on the jury.

14. The last exception is to the charge of the court on the subject of corroboration. The material portions of the charge of the court are as follows:

"The material elements are, first, the giving birth by Frances Burghart of a child; it is alleged that this occurred, that is put in issue by the plea of not guilty, and constitutes one of the material elements; second, the alleged illegitimacy of such child, that is, that it was begotten and born out of lawful wedlock; and third, that the defendant is the father of said child; and it is incumbent, as I say, for the state to establish it, by a preponderance of the evidence in this case, by proof satisfying you of the truth of these elements

of the charge against the defendant, in order to warrant the return of a verdict of guilty as charged herein.

"It is prescribed by the statute which authorizes a proceeding of this character, that the testimony of the mother of the alleged illegitimate child must be corroborated, that is to say, a finding in favor of the state of guilty cannot be based on the uncorroborated statement of the relator herself. The corroboration should be of such a nature that when coupled with the previous evidence of the mother, it would lead the jury to the conclusion that the defendant is the father of the child.

"You have heard the evidence in this case and it is for you to determine wherein the truth lies, bearing in mind this principle of law requiring corroboration of the testimony of Frances Burghart in order to warrant a verdict for the state. If upon consideration and comparison of the evidence in the case you arrive at the conclusion there is no corroboration of the testimony of the relator, then it would be your duty to return a verdict of not guilty, notwithstanding the fact in that case you might believe what the relator had testified to as being absolutely true, if in considering the record in this case you find there is no corroboration of her testimony, because the statute requires corroboration, it would be your duty to return a verdict of not guilty. But if upon a consideration of the record, you find that the evidence of the relator, Frances Burghart, has been corroborated and you are convinced by the preponderance of the evidence of the truth of the material elements of the charge, as I have stated them to you, then your verdict should be guilty as charged herein."

The court further charged the jury as follows:

"You should not be influenced by sympathy in this case in deciding the issues, nor swayed by passion or prejudice, but you should give judicial minded consideration to the case in the light of the instructions

of the court and upon such consideration, comparison and deliberation, let your verdict rest."

The charge of the court was absolutely correct although it would have been clearer if it had been followed up by a more technical definition of what would constitute corroboration. However, the exception in legal effect was to the language of the charge as given, and, as we have seen, that language was correct.

15. Counsel for defendant requested certain instructions which were refused and exception taken to such refusal.

The first request is as follows:

"You are further instructed that the evidence in this record showing that Frances Burghart and the defendant herein made love one to the other and showed affection one to the other is not to be construed as showing any improper motive upon the part of the defendant. Both of said parties were unmarried, and the law presumes that their conduct, one towards the other, was in good faith, and that no wrong was intended thereby."

This request, while adroitly framed and plausible, would have been misleading in this case. Taken alone, the endearments of the parties would not indicate an improper motive. Indeed, much of the conduct of the defendant, if considered apart from the rest of the testimony, would appear harmless and not tending to indicate any improper design on his part, but taken in connection with complainant's testimony and all the circumstances this conduct might speak volumes. It would have a tendency to mislead the jury for the court to select a particular part of the testimony and comment on that and say this act in itself is harmless. In this way a whole case might

be emasculated item by item when the various circumstances taken together might be overwhelming. The court had already instructed the jury that chastity and not unchastity was to be presumed and this was sufficient.

Another exception was taken to the refusal of the court to charge the jury as to the degree of corroboration required in cases of this character, but counsel for defendant frankly admits that the request was faulty, and it needs no further consideration here.

This case has required and received careful and minute scrutiny and consideration. Trifling errors have crept into the record as they are likely to do in any *nisi prius* trial, but after going over the testimony not once but several times the writer of this opinion can say that never in the whole course of his thirty-five years of experience on the bench has he examined a case in which the proven circumstances corroborated the testimony of a complaining witness to a greater extent than in the present instance. Were it a criminal case, where the element of reasonable doubt intervenes, he cannot imagine a jury hesitating for one moment to convict. And conceding that there may have been slight deviations from technical procedure, the result arrived at was correct.

Subdivision 3c of Article VII of our Constitution provides that upon an appeal to this court the whole testimony may be sent up, as was done in the case at bar, and, if upon examination of the matters thus submitted, the Supreme Court shall be satisfied that the judgment should be affirmed, notwithstanding any errors committed on the trial, they may affirm it. This amendment blazes the way to true justice in this case and in like cases.

We are satisfied that the conclusion arrived at by the jury was correct and sustained by ample testimony, and that there was no mistake which led to an unjust judgment, and it is therefore affirmed.

AFFIRMED.   REHEARING DENIED.

RAND, C. J., and COSHOW and ROSSMAN, JJ., concur.