Argued September 15, 1955, affirmed January 25, affirmed on
rehearing June 13, certiorari denied United States
Supreme Court November 5, 1956

## STATE OF OREGON *v.* CAHILL

293 P. 2d 169
298 P. 2d 214

*Harry G. Hoy,* Oceanlake, argued the cause for appellant. With him on the brief was B. Richard Anderson, Newport.

*William T. Hollen,* Special Deputy District Attorney, Newport, argued the cause for respondent. With him on the brief were Robert Y. Thornton, Attorney General for Oregon, Walter W. Foster, District Attorney, Dallas, and T. R. Adams, Special Deputy District Attorney, Taft.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK, BRAND and LATOURETTE, Justices.

BRAND, J.

The defendant Otto W. Cahill was indicted by the grand jury of Lincoln county for the crime of conversion of public funds in violation of OCLA, § 23-525 as amended by Oregon Laws 1941, ch 371, p 639. (See ORS 165.015.) The indictment alleges that

"The said Otto W. Cahill on the 1st day of February, 1954, in the said County of Lincoln and State of Oregon, then and there being, did then and there have in his possession and under his control a certain sum of money, to-wit, the sum of $750.00, which said sum of money was then and there the property of the Taft-Nelscott-Delake Water District, a municipal corporation of Oregon, and that he did then and there feloniously and fraudulently steal, make away with and convert to his own use the said sum of $750.00, and did then and there at said time and place wilfully and feloniously neglect and refuse to pay over and deliver the said sum of $750.00 as required by law, and did then and there at said time and place wilfully and feloniously fail and refuse to pay over said sum of money then lawfully demanded so to do by said Taft-Nelscott-Delake Water District, contrary to the statutes in

such cases made and provided, and against the peace and dignity of the State of Oregon.''

The case was transferred to Polk county for trial. Defendant was found guilty by the jury, and from the ensuing sentence he now appeals.

Cahill was one of the commissioners, and secretary, of the Taft-Nelscott-Delake Water District, a public corporation. It is admitted that he received a check for $750 drawn on the District funds, which was delivered to him pursuant to a resolution of the Board of Commissioners dated June 8, 1951. Defendant denies that he converted the money and claims that he returned it to John D. Naylor, the then treasurer of the Water District, on January 21, 1954. He testified that the money was returned in cash composed of $50 bills. Naylor died on January 27, 1954. The Water District brought an action against Cahill to recover the money. His deposition taken in that action is in evidence.

Cahill takes the position that what he did with the money is unimportant. He rests his defense upon the claim that he returned the money, and he supports that claim by asserting that Naylor, who is silenced by death, executed a receipt acknowledging the return of the money. The state contends that the purported signature of Naylor is a forgery.

In general, the trial judge gave a fine example of intelligent and impartial conduct of a criminal case. He did, however, commit one error. On this we are all agreed. The facts are simple. The instrument commonly described as the ''questioned document'' was the receipt for $750 on which Naylor's name appears. The question is whether the signature was forged or genuine. One document was received in evidence bear-

ing the true signature of Naylor. This was Exhibit 31, a photostatic copy of a portion of the budget report of the District, bearing the signatures of both Naylor and Cahill. It was admittedly genuine. Cahill had signed a receipt acknowledging the return to him of "a photostatic copy of the budget report * * * showing signatures of the commissioners * * *" signed "Otto W. Cahill".

In addition to Exhibit 31, the court received in evidence, over defendant's objection, nine checks of the Water District on which appeared the signature of John D. Naylor, as treasurer. The undisputed testimony was that the signatures were genuine. A witness without contradiction testified that he saw Naylor sign them. The checks had all been cleared through the bank, but there was no evidence that the defendant had seen them. They had not been "admitted or treated as genuine" by Cahill. They were merely proven to be genuine by others. The statutes provide:

> "The handwriting of a person may be shown by anyone who believes it to be his, and who has seen him write, or has seen writing purporting to have been his, upon which he has acted or been charged, and who has acquired a knowledge of his handwriting." ORS 42.060.

> "Evidence respecting the handwriting may also be given by a comparison made by a witness skilled in those matters, or the jury, with writings admitted or treated as genuine by the party against whom the evidence is offered." ORS 42.070.

It is argued with some force that the nine checks were admissible for comparison purposes under ORS 42.060, and that ORS 42.070 was an additional permissive provision, "Evidence * * * *may* also be given * * *." (Italics ours.)

Our earlier decisions by eminent judges foreclose consideration of this argument of the prosecution. *Munkers v. Farmers' Ins. Co.,* 30 Or 211, 46 P 850; *State v. Tice,* 30 Or 457, 48 P 367.

█ It follows that a signature acknowledged by the defendant to be genuine is admissible for comparison by experts with the questioned document, but signatures proven to be genuine but not "admitted or treated as genuine" are not admissible for such purpose. Whether this statutory restriction is wise is not for us to say. The statute is valid and violation of it was error. The legislative purpose in enacting the statute is fairly obvious. The receipt of signatures claimed to be genuine for comparison with a signature claimed to be false, might lead to an almost endless excursion into collateral issues. The jury would first have to resolve every contested question as to the genuineness of the signatures offered for comparison before it could safely use them for comparison with the signature on the questioned document. Signatures conclusively proven to be genuine are as relevant and as significant for purposes of comparison, as signatures "admitted or treated as genuine" by the defendant.

The use of the nine checks for comparison was error, not because they were not genuine, and not because they were without probative value, but simply because they were a type of evidence forbidden by the statute on the grounds of extrinsic policy—the avoidance of collateral issues. In this case we would say that genuineness of the nine checks was conclusively established, but not in the manner required by statute. Error was committed but the erroneous use of the inadmissible checks by the experts tended strongly to reduce the risk of mistake on their part when they

pronounced the signature on the receipt to be a forgery, after comparing it with the admitted signature.

The constitution of this state provides that either party may have attached to the bill of exceptions "the whole testimony, the instructions of the court to the jury, and any other matter material to the decision of the appeal." It then provides:

"If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial; or if, in any respect, the judgment appealed from should be changed, and the supreme court shall be of opinion that it can determine what judgment should have been entered in the court below, it shall direct such judgment to be entered in the same manner and with like effect as decrees are now entered in equity cases on appeal to the supreme court. Provided, that nothing in this section shall be construed to authorize the supreme court to find the defendant in a criminal case guilty of an offense for which a greater penalty is provided than that of which the accused was convicted in the lower court." Constitution of Oregon, Art VII, Section 3.

The only serious question in this case is whether we should invoke Article VII, Section 3 and affirm the judgment "notwithstanding any error committed during the trial", or should reverse the judgment and remand the case for a new trial.

Attention is first directed to the fact that this defendant was not indicted for forgery. He was indicted and tried on the charge that he feloniously and fraudulently converted to his own use $750 of public funds which were in his possession. The question is, did he convert the money?

The issue of forgery is neither the sole nor principal one in the case. The issue is criminal conversion, on which, to be sure, the question of forgery was material. Though there was weighty evidence on other issues, the question of forgery seems to have absorbed the attention of counsel and court.

The narrative begins with June 8, 1951. Defendant Cahill was a member of the Board of Commissioners of the Taft-Nelscott-Delake Water District, hereafter called the Water District. He was also its secretary. The minutes of the meeting of the Board on June 8, 1951 are signed by Cahill as secretary. They contain the following recital:

"The Secretary reported he had been advised that several Federal Departments would soon have available for purchase by disabled veterans and other individuals, numerous items required by the Water District, and requested that $750.00 be authorized for such purpose, as a deposit of that amount would tie up anything required.

"By unanimous consent the amount of $750.00 was authorized to be transferred to the personal account of the Secretary for the purchase of material and equipment in the event inspection of such items determines that the District will benefit from such purchase."

The important items are (1) he was advised by several Federal Departments (2) items would soon be available for purchase (3) by disabled veterans; (4) Cahill requests $750 (5) $750 transferred. These items will appear in the later testimony. J. C. Shields was clerk of the Board and was present at the meeting. He testified that Cahill made a statement

"that through him being a war veteran there would be available to him for purchase a quantity of material, in which would be some material which could

be used advantageously in the Water District, at a very low cost, and it was not immediately available but would be in a short time, and that in order to purchase it he would necessarily have to have the funds available when he made the purchase, and the Water Board at that time transferred to his personal account the sum of $750.00 for that purpose.''

Shields also testified that the check was returned from the bank in the regular course.

On June 11, 1951 a check was drawn payable to Cahill for $750 on the North Lincoln Bank, signed for the Water District by Noble and Cahill. The check is in evidence and its tenor is undisputed. It bears date of June 11, 1951, and on the back appears the indorsement ''Otto W. Cahill''. The perforation reads ''Paid —6-12-51''. A typed copy of an original deposit slip was produced by the Lincoln Bank and identified as such by the head bookkeeper. The original deposit slip had been given to Cahill. The copy was received without objection. Subsequently the microfilm of the original deposit slip was produced and the jury was permitted to see it with the aid of a ''recordak'' machine. The deposit slip was dated 6-12-51. The name of the depositor appearing thereon was Otto W. Cahill, and on one line appears the following: ''TND Water District 750.00''. The head bookkeeper testified that Cahill made up the original deposit slip which was microfilmed in regular course of business and that Cahill wrote it. TND obviously refers to Taft-Nelscott-Delake, the name of the Water District. What does the defendant say about the original disposition of the $750 check? On direct examination by his counsel, Cahill testified as follows:

''Q. There is a deposit slip in evidence here which shows a deposit of $750.00, and states on its

face that it was for a check made by the Taft-Nel-scott-Delake Water District. Will you tell whether or not, whether you deposited this money that you received from the Board?

"A. Well, my best recollection is that I did not."

Concerning his receipt of the $750 check, Cahill testified:

"Well, when it was first authorized the clerk asked me if I wanted a check that day or anything, and I said No, and he said, I'll make it up so we can get our records clear, and the following noon, I believe, or some time I went into the Water Office and the check was laying on my desk, it was made out to me, it required my signature and the Treasurer's. I signed the check, turned it over and endorsed it on the back, and gave it to our former superintendent Lynn McKinney and I said, Mac, take this down to Earl Noble's house and have him sign it. He said, What do you want me to do with it, and I said, Here is an envelope,—a brown manila envelope, about the size that would fit into a safety deposit box—I said, Go down to the bank, get it cashed and put it in this envelope and bring it back; and I'm positive that is what he did. The envelope was returned to me and the money has always been in cash in that envelope, and on the envelope I had placed 'Property of the Taft-Nelscott-Delake Water District'. Some time later I put it in my safety deposit box—I don't remember if it was that day, because we had a safe in the district office. * * *"

Again, Cahill testified that the money was in his safety deposit box. We quote:

"Q. Did you use it for any purpose during the time you had it?

"A. No."

Again we quote:

"Q. Now Mr. Cahill, I would like to have you describe again just what happened on this $750.00 deposit that you made the day after this check was—

"A. I did not deposit it.

\*    \*    \*    \*    \*

"Q. Now, your bank records show a deposit on June 12, 1951, of $750.00. Is that this same check?

"A. I don't think it is.

"Q. Well, what is it?

"A. That's a deposit my wife had made.

"Q. Oh, your wife happened to have $750.00?

"A. She has several accounts of her own.

"Q. Do you know where she got that $750.00?

"A. Well, she owns quite a number of things that are strictly her own. I don't know where she got that one. She can testify to it.

"Q. Isn't that rather coincidental, Mr. Cahill, that she would make a deposit in the same amount as this check, the day after you received it?

"A. Well, it would appear so. But I know that I got the money, but whether it was deposited or not I question.

\*    \*    \*    \*    \*

"Q. Now Mr. Cahill, I will refer you to your testimony before the Lincoln county grand jury on the 31st day of March, 1954, and I will ask you whether or not you advised the grand jury or testified in the grand jury under oath that you cashed that check and deposited it in the Lincoln bank?

"Q. (A.) No; I think I stated that I had had it cashed but that I did not deposit it."

When Cahill was shown the deposit slip he testified that he was sure he never prepared such a deposit slip.

In connection with this question concerning the initial disposal of the $750 check, the court reporter

who took the testimony before the grand jury, read to the jury Cahill's testimony before that body, Mr. Thornton, the Attorney General, and Mr. Hollen, the prosecutor, being present. We quote:

> "Question: 'Where was that money between the period of 1951 until now?' —Answer: 'In the Water Office of the City'.—Question: 'Was that in cash?'—Answer: 'It was in cash. They gave me a check, and I cashed it, because I thought we were going to have a deal very shortly, and I put it in cash in the Water District safe'.—Question: 'Did you ever deposit that money in the bank?'—Answer: 'I did, when I gave them the check first, and—'—Question: 'And when did you draw the cash?'—Answer: 'Well, it was some time later, I closed out all my bank accounts when you sued me on behalf of Lincoln county without notifying me about it'.—Question: 'Was that when you took out the cash?' —Answer: 'No; it was some time before I did that'. Question: 'Do you recall how long before?'—Answer: 'No, I don't'."

The court reporter also read from her notes taken at the grand jury session, the following:

> "Question: 'And you proceeded to cash the check and kept the currency in the safe?'—Answer: 'Well, for a period of time it was in my account.'—Question: 'In other words, you cashed it and put the money in your personal account?'—Answer: 'Yes, that's right, to begin with.'—Question: 'Then you later transferred it? You later put currency in that amount in what?'—Answer: 'In the Water District safe.' "

At the main trial the same matter came up on cross-examination—questions by Mr. Hollen.

> "Q. Do you recall the further question by Mr. Thornton: 'And you proceeded to cash the check

and kept the currency in the safe?'—Do you remember that question?

"A. That's right.

"Q. And do you remember that you answered: 'Well, for a period of time it was in my account.'

"A. In my safe deposit box is what I testified to.

"Q. Do you recall that answer?
"A. No, I do not. Not the one you read.

"Q. You deny you made that answer?
"A. That's right.

"Q. Now, do you recall a further question, after you made that response: 'In other words, you cashed it and put the money in your personal account?'— — Do you remember that question by Mr. Thornton?
"A. No, I don't. I don't think he made it.

"Q. And do you recall answering to that question: 'Yes, that's right, to begin with.' — —''

Again, Cahill testified, "I did not deposit the Water District check * * *." He added, "there had been a $600.00 deposit put in that account prior to that date."

We note in passing that Mrs. Cahill, who was not in the room when her husband testified, made the following statement under oath, "I don't ever recall a deposit of $750.00." She added that she could "swear" that the $750 was not placed in Mr. Cahill's bank account.

Mr. McKinney, the man who was alleged to have taken the check to the bank, cashed it, and returned with the cash, testified as follows:

"Q. Were you ever requested by Mr. Cahill to take any check for any sum of money to the North Lincoln Bank at Taft and cash it?
"A. No sir.

"Q. Did you ever do such a thing?
"A. No sir.

"Q. Did you at any time ever do such a thing?
"A. No sir.

"Q. Did you at any time ever go to any bank for Mr. Cahill and bring him back cash?
"A. I never did.

"Q. Did you at any time ever go to any bank for Mr. Cahill and bring back any brown envelope?
"A. I never did."

The testimony of Cahill contains intrinsic inconsistency and falsehood, even without reference to the contradictory evidence of other witnesses. The climax was reached near the end of the trial. After all the sworn averments that the money was not deposited in the bank, Cahill's counsel made two announcements to the court, as follows:

"Mr. Hoy: If Your Honor please, I think—it will shorten the matter, and it's not very material anyhow—I think I think the testimony on that deposit—the question of whether or not that $750.00 check was deposited for a time, the testimony of the defendant was in error."

After the head bookkeeper at the bank had again testified, Mr. Hoy said, "we will admit that the money was deposited."

Now let us see if the judicial admission that the money was deposited was "not very material anyhow".

We now turn to an analysis of the bank statements showing deposits, withdrawals and balances in the account of Otto W. or Goldie Cahill, from December 26, 1950 to January 13, 1954. The statements were identified by the head bookkeeper of the Lincoln Bank as identical to the originals which had gone to the depositor. They were received with "No objection".

We will trace the ebb and flow of the balance in the bank account from the date of the Water District check down to the end of the year 1953. After the deposit of the $750 on June 12, the balance in the joint account was $1,016.64. This balance was reduced with each entry until July 5, 1951. The entry immediately preceding July 5, 1951 was still in excess of $750. It is shown on the statement as $836.72. On July 5 there was a deposit of $268.74 and a withdrawal of $509.67. We make the following simple computation:

| | |
|---|---:|
| Balance | $ 836.72 |
| Add deposit July 5, 1951 | 268.74 |
| New total | 1,105.46 |
| Deduct check | 509.67 |
| New balance | $ 595.79 |

The new balance at the end of the day's business shows on the bank statement as $595.79, which is $154.21 less than the amount of the trust fund. The withdrawal of this portion of the trust fund cannot be attributed to Mrs. Cahill. A copy of the check for $509.67 is in evidence. It was drawn by the defendant. The payee was the Lincoln Bank, and Cahill testified:

"Q. Now, you paid that note off to the Lincoln Bank on the 5th day of July 1951, did you not?
"A. I imagine I did, about that time."

There can be no contention, and there is none, that any of the small checks or the $509.67 check represented any withdrawal of the $750 except for defendant's personal use and benefit.

From July 5, 1951 and until the account was closed in January, 1954, the balance equaled or exceeded $750

during only two periods: (1) Between July 8, 1952 and July 11, 1952, the balance varied between $836.42 and $755.16, but that balance was rapidly reduced by many small checks, the largest of which was $76, until on October 20, 1952, the balance was $255.98. (2) On October 21, 1952 the balance was augmented by a deposit of $2,213.84, and stood at about that figure for two days, but on October 23 a check was drawn for $2,112.00, reducing the balance on October 25, 1952 to $211.38. A copy of the check is in evidence. It was payable to the Coast Chevrolet Co. in the sum of $2,112.00 and was drawn by the defendant. This withdrawal cannot be charged to the defendant's wife, yet it reduced the account until it was $538.62 short of the amount of the trust fund.

No one would suggest that any part of this sum represented an expenditure for the Water District. There was only one other check drawn between June 12, 1951 and January 13, 1954 which equaled or exceeded $120. That was a check for $125 drawn out on December 16, 1953, leaving a balance on that date of $104.97. No one has claimed that any of these small withdrawals were for other than personal use of defendant or his wife.

On various occasions between June 12, 1951 and January 13, 1954 the balance was reduced to a nominal sum, as for example, $13.20 in January, 1952; $18.68 in June, 1952; $20.16 in January, 1953; $3.09 in June, 1953; and $4.01 in December, 1953. The account was closed on January 19, 1954 at $2.74.

■ The undisputed evidence establishes that at various times between July 3, 1951 and January 13, 1954, the defendant converted portions of the fund to his own use, and that by January 13, 1954, if not at an earlier

date, he had converted all of the fund, with the possible exception of $2.74. The indictment charged that defendant converted the fund to his own use and did also charge that he failed and refused to pay over the fund. There was no motion to require the state to elect whether it would stand on the conversion or on the failure to return the fund. The conversion and the failure to return were alleged to have occurred on the first day of February, 1954, but the date on which the conversion occurred was not a material allegation, and conviction could have been had on proof that the conversion occurred at any time within three years prior to the commencement of the action. *State v. Wilson,* 127 Or 294, 271 P 742. The period of the statute of limitations applicable to the crime charged was three years. ORS 131.110. The statute also provides that

> "The precise time at which the crime was committed need not be stated in the indictment, but it may be alleged to have been committed at any time before the finding thereof and within the time in which an action may be commenced therefor, except where the time is a material ingredient in the crime." ORS 132.610.

It follows that conviction would have been proper on the undisputed evidence reviewed above, showing, (1) deposit of the fund and its conversion piecemeal after July 3, 1951 the last day on which the fund remained intact in the bank account, and (2) proof that the fund was never withdrawn as such but was used up by the personal withdrawals from the account. The conversion was all within the three-year period. If the state had never alleged or proved a failure to return the $750 to Naylor, it could have relied solely upon the conversion established by the evidence reviewed supra, and the fact that the continuing acts of conversion did

not occur on the date specified in the indictment would be immaterial. The statute provided, in part:

> "If any person shall receive any money, warrant or instrument in writing directing the payment of money for any * * * municipal or public corporation * * * or shall have in his possession any money, warrant or instrument in writing directing the payment of money belonging to such * * * corporation, or in which such * * * corporation has an interest, and shall in any way *convert to his own use* any portion thereof or shall * * * neglect or refuse to pay over or deliver any portion thereof, as by law directed and required * * * such person shall be deemed guilty of larceny * * *." OCLA, § 23-525, as amended by Chapter 371, Oregon Laws, 1941; and see, ORS 165.015 covering the same provisions, with slight verbal changes. (Italics ours.)

The error in admission of evidence later to be discussed was irrelevant to the question as to the original conversion of the fund. The logical conclusion is that the verdict of guilty was both necessary and proper if the jury performed its function, and it will be shown hereafter that the judgment should be affirmed despite an error committed in dealing with another issue of the case. It may be argued that the conversion of the $750 is not conclusively proven to have been done by the defendant Cahill. We have not overlooked the fact that the money was deposited in a joint account of Cahill and his wife. We assume that some of the checks were drawn on the fund by Mrs. Cahill, for she testified in general terms, "He puts it in and I take it out." She did not, of course, say that she alone drew checks on the joint account and the undisputed evidence shows that the large checks were drawn by the defendant personally.

Several questions immediately arise to confront the defendant. The resolution of June 8, 1951 authorized transfer of $750 to the "personal account of the secretary." Obviously this resolution referred to the account of Cahill on the books of the Water District—not to his personal bank account. But let us assume that the resolution authorized deposit in the "personal account" of Cahill *at the bank.* Did such resolution authorize deposit in a joint account subject to check by a third party (Mrs. Cahill) who was a stranger to the transaction? We think it will not be denied here that when a man deposits money in a joint account with his wife, he authorizes the bank to honor the checks drawn either by himself or his wife. Can a man accept trust funds belonging to the public and then deposit them and authorize the bank to pay them out on checks drawn by his wife for personal or family expenses? If Mrs. Cahill drew some of the small checks against the joint account, it was because Mr. Cahill had authorized it by depositing the money in the joint account. There is no more excuse for putting the responsibility on his wife than there is for placing it on the dead man Naylor. This is especially true in view of the fact that Mrs. Cahill expressly denied knowledge that the $750 was ever put in the joint account.

In view of the judicial admission by his attorney that the money was deposited in the personal joint account, and of the conclusive evidence that this account was reduced to nominal sum by withdrawals for personal use made by Cahill or his wife, with his authority, we have assumed thus far what seemed to us obvious—namely, that Cahill converted the money. It now seems appropriate, however, to examine our conclusion in that respect more closely.

It has been suggested, though not by the defendant,

that the transaction of June 8, 1951, whereby the Water Board authorized transfer of $750 to the defendant Cahill, and the check which was given him on the next day, resulted in the creation of the relationship of debtor and creditor between the Water Board and its secretary, Cahill. From this premise, the conclusion is drawn that the defendant would be entitled to use the $750 in his own business, or in any other way, and that his only obligation would be to cancel his indebtedness, either by buying the pipe for the District or by returning the money if the pipe were not bought. It is further argued that the Water District wanted defendant to treat the money as his own so that he might, as an individual, or disabled veteran, make a better bargain for the District. If that was the understanding of the District, it was not shared by Cahill, for he testified:

"My intention was to get the pipe we required, and probably turn that fund that I had back to the district and then they would issue a check for it."

Cahill also swore that he "lacked the authority to purchase it until it had been inspected by the superintendent." Certainly Cahill never claimed, nor does he now claim, that the District merely loaned him the money. His story given under oath is that the check of the Water District was cashed, and the money, in the form of $50 bills, put into an envelope. On direct examination he testified:

"* * * The envelope was returned to me and the money has always been in cash in that envelope, and on the envelope I had placed 'Property of the Taft-Nelscott-Delake Water District'. Some time later I put it in my safety deposit box—I don't remember if it was that day, because we hade a safe in the district office. I told my wife if anything

happened to me, there was money that belonged to the Water District down there and it was clearly marked and tagged, and to give it to them.   *   *   *''

He also testified as follows:

"Q.  Did you use it for any purpose during the time you had it?
"A.  No."

He said the money was out of the safety deposit box a "couple of times." He was asked, "What would you do with it when you took it out?" He answered, "I think it was always in the Water Office safe."

From the foregoing it sufficiently appears that Cahill repeatedly attempted to convince the jury that he had handled the fund in accordance with the strict requirements of a fiduciary dealing with trust funds. Had he been successful he would have avoided the necessity of justifying his use of the fund as his own. His attempt failed because he ultimately concluded that he must admit that the money was deposited in the joint bank account from which the undisputed evidence shows it was withdrawn by himself and his wife for personal use. At this point a distinction must be noted between three criminal statutes of this state defining three types of embezzlement. The first is embezzlement by officer, agent or servant. OCLA, § 23-523 (ORS 165.005.) The second is embezzlement by bailee. OCLA, § 23-524 (ORS 165.010), and the third is embezzlement of public funds. OCLA, § 23-525 (ORS 165.015.) Each of the three is given the name of larceny, though none of them define any act known as larceny at common law. None involve the common-law element of trespass to the possession of another. These crimes are designated "larceny" merely to indicate that the crime of embezzlement is equal to and

shall be punished as larceny. *State v. Reinhart,* 26 Or 466, 38 P 822 (construing OCLA, § 23-523.) The decisions under all three statutes are properly collected in the Oregon Digest under the heading "Embezzlement". Under the first section mentioned, an intent to defraud is necessary. *State v. Hattrem,* 140 Or 371, 13 P2d 618; *State v. Cooke et al.,* 130 Or 552, 278 P 936; *State v. Monk,* 193 Or 450, 238 P2d 110. Even when felonious intent is a necessary element of the crime it is held that if a person unlawfully and with such intent uses the money of another for his own benefit he is guilty of embezzlement, though he had intended to return the money to the owner. *State v. Cooke et al.,* supra. Embezzlement under OCLA, § 23-523 (ORS 165.005) must be distinguished from embezzlement by a bailee, and embezzlement by converting public funds, in this important particular. Under the last mentioned statutes, intent to defraud is not an element of the crime. *State v. Stiles,* 81 Or 497, 160 P 126; *State v. Chapin,* 74 Or 346, 144 P 1187 (larceny by bailee) ; and *State v. Ross,* 55 Or 450, 104 P 596, 106 P 1022. The Ross decision bears on the pending case in other respects. It was there held that a conversion of public funds

"is fully accomplished by any exercise of dominion over a chattel without the authority of the owner, whereby the true owner is deprived of the enjoyment of his chattel. And it is wholly immaterial whether the person so converting did it for his own personal advantage or not. * * *" 55 Or at 470.

As held in other jurisdictions, the only intent which must be proven on a charge of conversion of public funds or of larceny by bailee, is the intent to do the prohibited act. *Mansur v. Lentz,* 201 Mo App 256, 211 SW 97; *Tidd v. State,* 42 Ohio App 66, 181 NE 280; *People v. Warren,* 122 Mich 504, 81 NW 360; *State v.*

*Sheegog,* 47 Okla Cr 421, 288 P 993; *Landrum v. State,* 60 Okla Cr 259, 63 P2d 994. In *Tidd v. State,* supra, the court said of a statute prohibiting the conversion of public funds:

"* * * The courts have interpreted the foregoing provisions to intend in their effect that it is a criminal conversion of public funds for an officer who is intrusted with the control and expenditure of such funds to use them for any purpose other than one provided by law. * * *"

While the crime of conversion of public funds in most respects resembles the crime of embezzlement by officer, agent or servant, the analogy fails when intent is in question. It might be conceded that if *A* gives to *B* $10 with which to purchase goods for *A,* and if *B*, in good faith mingles *A's* money with his own, the mere mingling would not make *B* an embezzler, there being no fraudulent intent, though if he later used the money as his own, with fraudulent intent, he might be guilty. The supposed illustration is inapplicable in the case at bar. The plain purpose of the statute under which Cahill was tried and convicted is to protect the public against any use of public funds for any but public purposes. It applies not only to any money owned by a public corporation, but to any money in which it has an interest. If the person receiving such money even loans it without interest, he is guilty of larceny. If we assume that Cahill was to buy pipe and pay for it with his own check as he once intimated he had done, that would not imply that he could in the meantime use the public funds for the payment of private obligations.

From the Restatement of Trusts we read:

"*Agent may also be trustee.* A person may be at the same time both an agent and a trustee for

the same person. If an agent is entrusted with the title to property for his principal, he is a trustee of that property." Restatement of the Law, Trusts, § 8.

To the same effect see 1 Scott on Trusts, § 8, p 65; and see, *Minneapolis Fire & Marine Ins. Co. v. Bank of Dawson*, 193 Minn 14, 257 NW 510. The same authority states the universal rule:

"There is a fiduciary relation between trustee and beneficiary (see § 170); there is not a fiduciary relation between debtor and creditor as such." Restatement of the Law, Trusts, § 12.

Can it be seriously argued that there was no fiduciary relationship between the Water District and Cahill who was both a commissioner and its secretary when he received the public funds? Again it is said:

"If one person pays money to another, it depends upon the manifested intention of the parties whether a trust or a debt is created. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created. If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created." Restatement of the Law, Trusts, § 12g.

Can it be said that the Board of Commissioners intended to permit Cahill to use the money to pay personal debts, merely because they intended that he buy pipe for the District with it? It is even highly doubtful whether they could lawfully turn public funds over to a trustee, to say nothing of lending it to a borrower. See 1 Restatement of the Law, Trusts, § 12g, Illustration 10, p 44.

From 1 Scott on Trusts, we quote:

"It often happens that the parties to a transaction do not make it perfectly clear whether their intention is by the transaction to create a debt or a trust. The test is whether they intended that the person receiving the money should have the beneficial as well as the legal interest in it. If he was intended to have the beneficial and legal interests, if he was intended to have the use of the money as his own and to be under a merely personal liability to pay the money to the payor or to a third person, a debt is created. If, on the other hand, it was intended that the beneficial interest in the money should remain in the payor or should pass to a third person, a trust is created. * * *" 1 Scott on Trusts, § 12.2, p 86. See also, 1 Scott on Trusts, § 12.7, p 98.

In *State v. Florian,* 355 Mo 1169, 200 SW2d 64, the defendant was charged with embezzlement and his conviction was affirmed. Defendant procured checks from Sheehy for the purpose of using the proceeds to buy property for Sheehy. On appeal defendant contended that if there was a conversion it was a conversion of the checks, not of the money derived from cashing them, "because he had no right to cash the checks unless they constituted a loan", and that the relationship between defendant and Sheehy was that of debtor and creditor so that there could be no embezzlement. The court said:

"* * * The premise is false. The evidence shows that he procured the checks from Sheehy for the purpose of using the proceeds to buy the property for Sheehy. This constituted him an agent with authority to cash the checks and use the proceeds for the purpose specified. Therefore, the proof shows embezzlement of money, not checks. State v. Ross, 312 Mo. 510, 279 S.W. 411; State v. Miller, 332 Mo. 307, 57 S.W.2d 1080; State v. Wat-

564

kins, 337 Mo. 901, 87 S.W.2d 184; State v. McCawley, Mo.Sup., 180 S.W. 869. There is no merit in appellant's contention that the relation of debtor and creditor was created. The proof is that appellant got the checks to use the proceeds not for his own benefit, but to pay to the real estate company for Sheehy. * * *''

The case is directly in point. The reasoning would have been even more convincing if defendant had been dealing with public funds, as in the case at bar. The same reasoning was applied in *People v. Hill*, 2 Cal App2d 141, 37 P2d 849. And see, *People v. Meadows*, 199 NY 1, 92 NE 128; *Brown v. Christman*, 126 F2d 625; *American Surety Co. of New York v. Greenwald*, 223 Minn 37, 25 NW2d 681; *Dunlop Sand & Gravel Corp. v. Hospelhorn*, 172 Md 279, 191 A 701; *Tate v. Emery*, 139 Or 214, 9 P2d 136; *State v. Browning*, 47 Or 470, 82 P 955; *Jansen v. Tyler*, 151 Or 268, 47 P2d 969, 49 P2d 372.

In *State v. Cooke et al.*, supra, the defendant argued that the relation of debtor and creditor was created, rather than that of trustor and trustee. The contention was rejected by this court.

Finally we turn to the statute defining the powers of the Water District. That District was formed under the provisions of OCLA, § 116-1001, et seq. In that statute we find no authority, express or implied, which would authorize the District to create a relationship of debtor and creditor between itself and one of its officers. On the contrary, it is expressly provided that

"All moneys of such corporation shall be deposited in one or more banks to be designated by the commissioners, and shall be withdrawn or paid out only when previously ordered by vote of the commissioners, and upon checks signed by the

treasurer and countersigned by the chairman, or in his absence or inability to act, by the secretary. * * *'' OCLA 116-1015.

Cahill was chargeable with knowledge that any such arrangement amounting to a personal loan would be ultra vires the corporation. Neither he nor we can now immunize him from liability on the theory that the money was delivered to him with the understanding that he might use it for personal expenses as a debtor of the District. We conclude that the deposit by Cahill of the funds of the District in the joint account subject to check, was a conversion of the fund. But the essence of the crime was the use of the fund over a period of time as his own, and in either event he was guilty of conversion of public funds. While felonious intent to defraud was not an element of the crime, there was ample evidence to establish such intent. It follows that the defendant was guilty on the undisputed evidence, even if he later returned the money, which we think he did not do. Mr. Cahill attempted to shift the responsibility to a dead man in whom he had expressed complete confidence—a man on whom there was no hint of guilt expressed by any person. Barring the questioned signature on the receipt, and Cahill's testimony, there is not a scintilla of evidence that Naylor received the money, and it was never found by the officers of the District, as would surely have appeared if Naylor got the cash and did not steal it. The jury could have found that the signature of Naylor was a forgery even if no other signatures had been used for comparing.

The judicial admission that the money was deposited in his bank account has a damning effect on defendant's entire case. It establishes that he testified falsely.

His statement that he was "positive" that McKinney cashed the $750 check and returned the cash in an envelope is necessarily false. If it were true, the bank statement would show both the deposit and the withdrawal of $750 on June 12, 1951. But the statement shows deposit and no withdrawal. The money went into the bank, but there is no scintilla of evidence that it was ever taken out except as it was drawn out in driblets on checks of Cahill or his wife. Cahill offers no explanation or theory as to how the fund in the bank was translated into $50 bills in an envelope, as testified to by him. In truth, he precluded himself from offering any such explanation by claiming that he had the cash in an envelope from the time McKinney was supposed to have gotten it on June 12, 1951. In view of the undisputed record he can now claim no more than that he used the fund and violated his trust, but dug up $750 somewhere else and paid it to Naylor on January 21, 1954.

Essentially, the evidence thus far considered is inconsistent with the existence of any cash fund in an envelope.

Having established the deposit and nonwithdrawal of the $750 in cash, we proceed with consideration of Cahill's story concerning his subsequent dealings with the money and with the Water District.

It was testified that Cahill said that when the material was available he would have to act at once and have the funds to pay at the time, and that the federal departments would "soon have available" items for purchase. By his own testimony he kept the $750 for over two and one-half years. The matter apparently slept until the meeting of December 29, 1953. The minutes were signed by Cahill as secretary, but his name was later crossed off by reason of the

recall proceedings instituted against him. The minutes read as follows:

"* * * the Secretary [i.e. Cahill] reported on a confidential developemnet [sic] in that area, and that in order to meet an anticipated service demand, the Special Purchase Fund authorized to be used at the discretion of the Secretary when a substantial saving could be made, *had been obligated* for new 4", ten guage [sic], Dipped & Wrapped Pipe, said pipe being surplus from military requirements." (Italics ours.)

Witness Shields testified that Cahill, the secretary, made the statement "that he had made a purchase of 3100 feet of four-inch standard steel pipe dipped and wrapped, subject to the inspection of our superintendent, and that he had sent his certified check for $800.00 to cover the purchase." Shields, the clerk of the Board, testified that at a meeting on January 8, 1954, Cahill, in answer to a question about the "special purchase fund" said, "it was not available yet, but would be in a short time, or words to that effect"— "referring to the pipe". Shields also testified that at the Board meeting of January 14, 1954, Cahill "again stated that he had ordered the 3100 feet of pipe, and it would be available in a short time." The minutes recite "Commissioner Cahill reported that the material would be available in about 30 days." The undisputed evidence is that defendant never told the Board the details of the purported deal, or with whom it was made.

In a deposition taken in a civil action by the Water District against Cahill, he testified somewhat vaguely concerning the deal, as follows:

"Q. And, what department of the Federal Government was to have this material?

"A. Oh, — — the Federal Security Adminis-

tration — — I mean, the Federal — — it was an agency in Portland. It was General Services Administration was one of them. They handle the disposal of surplus materials within governmental agencies. I had the occasion to write them on another matter and they suggested to contact the Army Engineers, the Atomic Energy Commission, and some others for something that I was interested in."

He was asked if he purchased any property for the district, and answered, "I did not", but claimed he made a "tentative arrangement" for some materials. He was asked, "How much", and he answered, "I forget the amount now". He was asked the price, and answered, "I don't recall."

He acknowledged his signature on the minutes of December 29, 1953, admitted that he prepared them, and finally said that they were in error and that he did not "obligate" the money for the purchase of any materials. He denied that he had stated to the Board that he had bought the pipe for $800 and sent a certified check in that amount. He was contradicted by witnesses Shields, Stager, Baxter, Williams, Bolton, Reed, and Brown. He denied that he had reported that the pipe would be ready in about 30 days, as shown in the minutes. He denied that he made the deposit slip for $750, yet he finally admitted that he did deposit the money. He said he did not recall testifying before the grand jury that for a time the money was in his account, yet the minutes of the court reporter show that he did so testify.

Cahill's testimony concerning the correspondence, or alleged correspondence, relative to the purchase of the pipe, is enlightening. He said it was in the District files. Again, "The correspondence is in the office." Attorney Stager testified that prior to the

taking of the deposition, he served notice to produce all documents relative to the purchase, or to the money. He wanted the correspondence, but no correspondence was produced. At another time Cahill said the correspondence was in his personal file. But he told Williams, his successor as secretary, that it was in the files. The clerk searched the files, but found nothing, according to several witnesses. The defendant's attitude of helpfulness vel non is illustrated, as follows: On January 25, 1954, the clerk of the District wrote Cahill the following letter:

"Dear Col. Cahill:

Relative to the $750.00 procurement fund used in the purchase of War Surplus Material for the District.

On instructions of the Secretary of the Board, a thorough search of the files in this office has been made for a copy of the letter of transmittal to the governmental department handling this matter. No such letter has been located.

In the event you do not have a copy of the letter in your files, the Secretary requests that you furnish this office with the name and address of the department, to which a request may be made for a copy of the letter.

Yours very truly,
J. C. Shields
Chief Clerk"

In reply and on February 6, 1954, Cahill wrote:

"Board of Commissioners
Taft-Nelscott-Delake Water District
Nelscott, Oregon

Gentlemen:

With reference to your letter of recent date, you are advised that an examination of the proper records will disclose that the Treasurer relieved

me of any further responsibility or connection with the matter prior to the date of your communication.

Yours very truly,
Otto W. Cahill"

This was a strange attitude to be taken by a man who had received a trust fund and who had a duty to make full disclosure.

Cahill was represented by his counsel at the deposition. At that time Mr. Hoy stated that there was no contention that anything was purchased.

Cahill, as a witness in the criminal case, said the envelope with the cash in it was returned to him by McKinney, and "the money has always been in cash in that envelope".

Witness Stager testified that Cahill said the pipe had been ordered and that a certified check had been sent and that "This was a very good bargain."

Witness Baxter confirmed that Cahill said he had sent a check for $800 for the pipe.

Witness Williams testified that at a meeting of January 14, 1954 "It was understood during this conversation that the $750 was asked to be returned to the Board" and that Cahill explained that he had used the $750 plus an additional $50 and had given a certified check to some company for surplus pipe. The pipe was 3,100 feet of 4-inch. He said Cahill told the Board it owed him an additional $50. Witness Bolton confirmed the testimony of Williams. The testimony was confirmed also by that of Allen Reed, the editor of a local paper, and Burt Brown. Cahill denied that he claimed $50 from the Board or ever gave a certified check.

Cahill testified that he thought the $750 had been in the Water District safe "a couple of times". He

testified that he did not have the combination to the safe, and then admitted he had "access to where they kept the combination." He testified that he didn't know whether the minutes of January 8 were false. Cahill testified that he did not remember being asked at the grand jury session with whom he made the agreement, and that he did not answer, "Well, a friend of mine in Portland." The court reporter's notes show that his testimony was as follows:

"Question: 'Who did you make that agreement with?'—

"Answer: 'Well, a friend of mine in Portland.'—"

It will be recalled that defendant on June 8, 1951, told the Board, concerning items available for purchase "by disabled veterans and other individuals." He also testified that he wrote to the General Services Administration, as an official of the Water District, "about four times since about 1951." He "thinks" he wrote Washington, D. C., "and it was referred to the Seattle office * * *." Question: "Don't they have an office in Portland?" Answer: "Yes." Question: "Did you ever contact the Portland office?" Answer: "No."

This case has been thought to depend on the question of the return of the money to Naylor on January 21, 1954. The first question is, where did Cahill get the cash to give to Naylor? There is no answer offered which is not inconsistent with the judicial admission that he deposited the money in his account and with the proof that he converted it piecemeal. Cahill testified on deposition that he told Baxter that he had turned the funds over to Naylor. Question: "did you state to Mr. Baxter at that time that you had given

Jack Naylor a certified check for $750.00?'' Answer: ''I did not.'' Baxter testified that Cahill told him that he had given Naylor a check.

Commissioner Baxter testified concerning a meeting and conversation with Cahill, as follows:

''A. * * * I thought I would like to talk to him regarding the matter and I called him up on the phone and asked him if I could see him for a few minutes, and he said, Yes, come on over; so I went over, and I said, You did not answer the letter that the board sent you regarding the correspondence in the file, and he said, Well, it made me a little sore that they registered the letter, and he said, However, I have the correspondence in my personal file, and he says, I took the correspondence and I checked, with the intention of going to Mr. Naylor's house and *when I got downtown I saw Mr. Naylor on the street and I called him over into my car and I gave him the papers and the check and a receipt. He said Mr. Naylor read the receipt, signed it and gave it back to him.* * * *'' (Italics ours.)

Baxter had been a friend of Cahill. His testimony casts serious doubt as to the entire story concerning the alleged return of the cash to Mr. Naylor. The defendant goes to great length to give the details of a purported return of the cash at Naylor's house. Yet, if his friend Baxter is not a perjurer, Cahill had told him of the same purported transaction as occurring in a car on a downtown street.

We have only scratched the surface of the inconsistencies and falsehoods to be found in the testimony of the defendant. The jury was necessarily required to decide whether substantially all of the public officials who appeared for the prosecution had testified falsely, or whether Cahill had done so.

In a case as flagrant as this, the jury could properly have found that the signature of Naylor was a forgery, even if no other signatures had been offered or received for comparison. The experts testified convincingly to intrinsic evidence of forgery apparent from a mere examination of the questioned signature and without reference to its comparison with other signatures. Exhibit 37 was an enlargement of the signature appearing on the questioned document. Even to the inexpert eye it shows characteristics suggestive of a tracing, as does Exhibit 34, a very clear photograph of the same signature. Stanley MacDonald, an experienced and highly qualified expert, testified, in part, as follows:

"The Witness: My conclusion that the signature John D. Naylor on the face of State's Exhibit 34 is a forgery is based upon the facts that the signature was not written with a flying pen—may I explain that to the jury?—a flying pen is where the pen is travelling across the paper as it comes in contact with it leaving a sharply pointed or tapered beginning stroke and is still travelling across the surface of the paper as it leaves the surface of the paper leaving a sharply pointed final stroke. Now, a flying pen also leaves thin and wide lines, that is, thin lines and shaded lines, and that is caused by the bouncing act of the pen as it crosses the paper—that is called variation in pen pressure. Now, in the questioned signature John D. Naylor disclosed upon State's Exhibit 37 we have blunt beginnings, a tremulous line quality which indicates very slow speed; and the same pressure throughout, the bouncing act of the pen has disappeared entirely—the pressure is constant throughout the entire signature, and at endings or terminals the ends are all blunt, which indicates that the pen in starting this signature rested on the paper before it started to move and then moved slowly

through the form of the signature and as it come to the end of the various sections of the signature it abruptly stopped and was lifted and started in the next section of the signature. Now, that leaves a line of the same width throughout the questioned signature, and we have the blunt beginnings and endings, which shows it was not written with a flying pen— it was written slowly and carefully, and the tremor disclosed here, that is, the little jiggle in the line throughout is the indication of very slow speed in writing.    *    *    *''

After presenting testimony based on comparison, the witness continued:

''*   *   *   In addition to that, referring to the questioned signature on the face of State's Exhibit 37, in the capital D there is a pen lift at a point where there logically would be no pen lift, that is, the pen is stopped and lifted at that point in the body of the capital D, in John D. Naylor, then it is placed in contact with the paper again before it starts to move, in almost the same identical spot, leaving a joint or intersection between the stopping and starting of the travel of the pen, something like this —(indicating)— —   *   *   *.''

The feature of the signature to which the witness referred is apparent on Exhibit 34 and on the enlargement, so that any layman can see it.

Similar testimony was given by the expert witness Alford.

Concerning the questioned document, the third expert witness testified that the signature "when enlarged   *   *   *   is very apparently a forgery."

Time and space forbid discussion of many other circumstances which would have warranted the jury in finding the defendant unworthy of belief. To summarize: The evidence established a wrongful conver-

sion of the fund which went into the defendant's personal account and came out only in checks, not one of which has ever been identified, even by Cahill, as representing a withdrawal of any part of the fund as such.

It is submitted that this is the kind of case in which the court should invoke Article VII, § 3 of the Constitution of Oregon, and should affirm, notwithstanding the error. Surely it will not be argued here that Article VII, § 3 of the Constitution is unconstitutional. The questions then relate to its interpretation and to the propriety or duty of invoking it. There can no longer be any serious question as to the meaning of the provision. It authorizes either party to send up the whole testimony, the instructions to the jury, and any other matter material to the decision of the appeal. This was done in the pending case. The Constitution then imposes upon this court a condition precedent to the exercise of its power to affirm notwithstanding any error. Affirmance is authorized only (1) "after consideration of all the matters thus submitted" and (2) if the Supreme Court shall then be of the opinion that the judgment "was such as should have been rendered". In view of the express requirement that we may affirm only after consideration of all matters thus submitted and of the provision that the "whole testimony" may be "thus submitted", it would amount to an unauthorized judicial amendment of the Constitution for us to hold that we cannot consider all of the evidence in deciding whether or not the judgment below should be affirmed "notwithstanding any error." In this case we are not overthrowing the decision of a jury; we are upholding that decision.

It would be futile at this time to argue that the constitutional provision does not apply to criminal cases. The text of the amendment conclusively indi-

cates that it was intended to apply to criminal cases, for it is

"provided, that nothing in this section shall be construed to authorize the Supreme Court to find the defendant in a criminal case guilty of an offense for which a greater penalty is provided than that of which the accused was convicted in the lower court." Constitution of Oregon, Art VII, § 3.

Furthermore, unless we are to throw to the winds all respect for our precedents, we must hold that the power is vested in this court to consider the "whole testimony" and affirm under the conditions specified.

The leading case on the subject is *State v. Ragan et al.*, 123 Or 521, 262 P 954. In that case the defendant was convicted of the crime of assault and robbery being armed with a dangerous weapon. In instructing the jury the trial court committed clear error when it stated that the law presumes that a pistol employed in an assault was loaded, and then imposed upon the defendant the burden of proving beyond reasonable doubt that it was not loaded. From the unanimous opinion of this court, we quote:

"There being present the foregoing error, we do not belive that a reversal and a new trial is the only remedy for the situation. In order to save the expense, delay and inconvenience of starting anew the ponderous machinery of a new trial, whenever error crept into the record, the voters of this state in 1910 amended the state Constitution so that it now provides that if the Supreme Court shall be of opinion, after consideration of all the matters submitted to it, that it can determine what judgment should have been entered in the court below, it may direct such judgment to be entered: Art. VII, § 3c, Or. Const. *We have read all of the testimoney and are thoroughly satisfied that the jury was well warranted in its verdict upon all phases*

*of the case concerning which no error was committed.* The jury thus found that the defendant committed an act of assault and an act of robbery.

\* \* \*

"In view of the fact that there is no error in that portion of the record which discloses that the defendant committed an assault, and robbed the complaining witness, the Circuit Court of Multnomah County is ordered to enter a judgment convicting the defendant of assault with intent to rob, as described in Section 1919, Or. L., and to sentence him to an appropriate penalty." (Italics ours.)

The Ragan opinion involves two propositions. First, a man charged with assault and robbery being armed with a dangerous weapon and found guilty of that crime by verdict and judgment in the circuit court may be found guilty and convicted by judgment of the Supreme Court of assalut with intent to rob, although the charge on which he was tried below was for violation of OCLA, § 23-428 (now ORS 163.280) and the crime of which he was held guilty by the Supreme Court was for violation of a different statute, OCLA, § 23-427 (now ORS 163.270.) The second proposition in the Ragan case is the one which is relevant here. It goes not to the power of this court but to the propriety or duty of exercising acknowledged power. The error committed by the trial court related only to the charge that defendant was armed with a dangerous weapon. It had no bearing on the evidence which established that defendant committed an assault and robbed the victim. Thus our decision in *State v. Ragan* stands for the proposition that if we read "all of the testimony and are thoroughly satisfied that the jury was well warranted in its verdict" on the basis of evidence which was not tainted by the error, a con-

viction will be upheld in this court. The bearing of the Ragan case upon that of Cahill is clear. In Cahill's case we may with equal propriety say that we have read all of the testimony and that the jury was well warranted in finding the defendant guilty of the identical crime charged in the indictment, and this we may do on the basis of the *conclusive* evidence that he converted a part if not all of the public funds entrusted to him by personally withdrawing and authorizing his wife to withdraw these trust funds from the bank, and using them himself and permitting his wife to use them, for purposes not connected with his trust. This is a portion of the case "concerning which no error was committed", for he was guilty of conversion long before he claims he got the receipt from Naylor—long before there was any questioned document for examination by experts. If he converted the fund in 1951 and 1952, the crime was complete, regardless of whether he repaid the District in 1954 or did not repay it and forged evidence of repayment. *Dobbins v. United States,* 157 F2d 259.

*State v. Ragan* does not stand alone. It has been cited with approval in *State v. Wye,* 123 Or 595, 263 P 60, and *State v. Folkes,* 174 Or 568, 150 P2d 17.

In *State v. Adler,* 71 Or 70, 142 P 344, defendant was convicted of receiving stolen property which was alleged to belong to a corporation, but there was no evidence that the company named was even a de facto corporation. On appeal this court *"after consideration of the record and the evidence submitted"* (italics ours) stated that it was of the opinion that the judgment appealed from was such as should have been rendered in the case, and judgment was affirmed "notwithstanding any errors  *  *  *."

In *State v. Karpenter,* 120 Or 90, 94, 250 P 633, 251 P 307, this court said:

"But aside from all that the evidence is all before this court. According to the record, including the evidence, it is the duty of the court to affirm the judgment of the defendant under Article VII, Section 3c, of the Constitution. The defendant was tried by two different juries and convicted by both. *A careful consideration of the testimony leaves no doubt in our mind, much less a reasonable doubt, that he is guilty.* * * *" (Italics ours.) See also, *State v. Newlin,* 92 Or 589, 182 P 133; *State v. Catholic,* 75 Or 367, 147 P 372.

In *State v. Newlin,* supra, 92 Or 589, 182 P 133, the court said:

"* * * Admitting that the principal witness for the prosecution is a man of bad reputation, and that the person to whom defendant sold the liquor is of doubtful character, no sane, fair juryman could have listened to the testimony adduced and thereafter have entertained the least doubt as to the guilt of the defendant. And perhaps we could stop at this, so far as the principal contention is concerned, and base our decision upon Article VII, Section 3, of our amended Constitution, but in deference to the able argument of counsel for the defense, we will consider briefly the objections urged by them." See also, *State v. Catholic,* 75 Or 367, 147 P 372.

In *State ex rel. Burghart v. Haslebacher,* 125 Or 389, 266 P 900, defendant was charged with being the father of an illegitimate child. A verdict of guilty was returned. The case was technically a civil proceeding, but due to its similarity to criminal cases, we quote:

"This case has required and received careful and minute scrutiny and consideration. Trifling errors have crept into the record as they are likely to do in any nisi prius trial, but after going over

the testimony not once but several times the writer of this opinion can say that never in the whole course of his thirty-five years of experience on the bench has he examined a case in which the proven circumstances corroborated the testimony of a complaining witness to a greater extent than in the present instance. Were it a criminal case, where the element of reasonable doubt intervenes, he cannot imagine a jury hesitating for one moment to convict. And conceding that there may have been slight deviations from technical procedure, the result arrived at was correct.

"Subdivision 3c of Article VII of our Constitution provides that upon an appeal to this court the whole testimony may be sent up, as was done in the case at bar, and, if upon examination of the matters thus submitted, the Supreme Court shall be satisfied that the judgment should be affirmed, notwithstanding any errors committed on the trial, they may affirm it. This amendment blazes the way to true justice in this case and in like cases."

*State ex rel. Rivinius v. Bartlett,* 141 Or 560, 18 P2d 590, involved a similar charge. The court said:

"We quite agree with appellant that part of the instructions given relative to corroboration were erroneous. If there were any doubt in our minds relative to the guilt of the defendant, such assignment would result in reversal. *However, an examination of the entire record convinces us that the verdict rendered was proper.* We therefore invoke the salutary provision of article VII, section 3c of the Constitution of Oregon, which authorizes this court to affirm the judgment notwithstanding the errors committed. Such action was taken in a similar case (State ex rel. Burghart v. Haslebacher, 125 Or. 389 (266 P. 900)), wherein the court said, 'This amendment blazes the way to true justice * * *.'" (Italics ours.)

In *State v. Metcalf,* 129 Or 577, 278 P 974, defendant was convicted of child stealing. The court said:

"We have attempted to review technically the proceedings incident to the trial, and do not find in them any error which, in our view, prevented defendant from having a fair trial. Seldom is a long drawn out trial like the present one conducted without some technical error creeping in. But even if such error had been committed, we feel assured from the evidence that the defendant took this child from the home of her parents for the vilest of purposes, kept her in concealment, lied as to his knowledge of her whereabouts, used her person for his own pleasure, and that he is clearly guilty as charged and, by subdivision 3c of Section 1 of Article VII of the Constitution, we would be fully authorized to affirm the judgment even in the face of technical error, but we are under no such necessity."

*Mount v. Welsh et al.,* 118 Or 568, 247 P 815, was a civil jury case for libel. This court said:

"* * * In the case at bar, the evidence is reported in its entirety. It follows that this court is empowered to make final disposition of the case and to render the judgment which should have been rendered below: State ex rel. Anderson v. Port of Tillamook, 62 Or. 332, 344 (124 Pac. 637, Ann. Cas. 1914C, 483). By a retrial of the case here, added responsibilities and additional labor devolve upon us. But our duty in the instant case, under the Constitution as determined by this court, seems plain. The case has been pending in the courts a long time. The litigation involved should come to an end. With the complete record before us, we are as well prepared to solve the facts and apply the law thereto as is the trial jury."

Again, in *State v. DeJonge,* 152 Or 315, 51 P2d 674, we referred to the "salutary mandate of Article VII, § 3 of our constitution."

Relative to the duty imposed upon us by Constitution Article VII, § 3, see also, *State v. Burke,* 126 Or 651, 674, 682, 269 P 869, 270 P 756; *State v. Cooke,* 130 Or 552, 562, 278 P 936; *State v. Friddles,* 62 Or 209, 123 P 904.

■ In this critical time, when dockets are cluttered, and when good men must cringe before the tragic fact of the law's delay, we see no merit in sending this defendant back for a new trial, when he has so conclusively proven himself guilty to the satisfaction of a jury and beyond reasonable doubt.

■ The constitutional provision emphasizes and broadens the salutary provisions of ORS 138.230 under which it has been often held that conviction will not be reversed for technical errors or defects which do not affect the substantial rights of the accused. If the constitutional amendment made no change in the law, it would be pertinent to inquire why it was adopted.

After the cases have been examined, one fact remains. The Oregon Constitution is our fundamental law. It applies a simple test as follows: This court is to consider "all the matters thus submitted", and having done so, "if the supreme court shall be of opinion * * * that the judgment * * * was such as should have been rendered * * * such judgment shall be affirmed * * *." Constitution of Oregon, Article VII, § 3.

A trial is no longer a game of wits; it is a search for truth and justice. We have found truth in the evidence of the prosecution and justice in the verdict of the jury and judgment of the court. We have examined the other assignments of error and find them without merit. The judgment of conviction is affirmed on the

authority of Article VII, § 3 of the Constitution of Oregon.

ROSSMAN, J., dissenting.

In dissenting, I, of course, concur in the part of the majority opinion which holds that substantial error was committed when, over the defendant's objections, the three handwriting experts were permitted to testify. That error, in my opinion, demands reversal. The error was greater than the majority acknowledge. It was amplified when the nine checks, which the experts used for comparative purposes, were received in evidence. When they were offered, the defendant made valid objections which should have been sustained. The checks were sent with the jury to the juryroom when they deliberated upon the verdict, and very likely were used by them. A handwriting expert is, in truth, an expert witness. Witnesses of that kind take pains to develop skill in making themselves effective and persuasive upon the witness stand. Their testimony cannot lightly be dismissed as nonprejudicial. They intend it to be a decisive factor in the case. Those words are not intended as a reproach for handwriting experts, but are expressed for the purpose of emphasizing that the error, which the majority acknowledge occurred, demands reversal.

The nature of the majority opinion may cause those who are unfamiliar with the facts of this case to infer that the transaction which occurred June 8, 1951, when the water district resolved that a check for $750 should be drawn in the defendant's favor, of necessity created a trust relationship and that the money became a trust fund. The relationship which was then established is the heart of this case. The defendant does not admit that upon his receipt of it the money became a trust

fund. When he pleaded not guilty he put in issue the charge that he received the fund as a trust res. Whether a trust relationship was established on that day or whether the relationship was that of debtor-creditor is a vital issue in this case. It is the jugular vein of the case. I believe that the relationship was one of debtor-creditor. As I shall presently show, the instructions virtually told the jury that when the defendant took the money he became a trustee of it. The jury was not told to determine the province in which he received the money, and it is crystal clear that it was given no criteria or test whereby it could ascertain whether he received the money as trustee or as debtor. Had such an instruction been given, it is at least questionable whether the defendant would have been found guilty.

June 8, 1951, the board of commissioners of the Taft-Nelscott-Delake water district met. The defendant was a commissioner and secretary of the board. He received no compensation for his services as commissioner or as secretary. During the course of the meeting, mention was made of the district's need of pipe. The defendant was an honorably discharged veteran of World War II, who held the rank of colonel at the time of his discharge. While serving overseas with the air corps he sustained a serious injury and upon his discharge was classified as a disabled veteran. During the discussion of the district's need for pipe, the defendant recalled that he had read an article in an engineering magazine which stated that the government possessed surplus pipe and that one of its agencies would offer to disabled veterans priorities in its purchase. The defendant gave to his fellow commissioners the information which he had gained from the magazine and thereupon a wish was expressed that he obtain some of the pipe. Presently a resolution was

adopted which contemplated a purchase by him. It read as follows:

"By unanimous consent the sum of $750.00 was authorized to be transferred to the personal account of the Secretary for the purchase of material and equipment * * *."

The word "Secretary" standing by itself might signify that the defendant was required to put the money into an official account, but any surmise to that effect is negatived by the purpose of the resolution and the following words "to the personal account." The clerk of the board, as a witness for the state, testified:

"* * * and the water board at that time transferred to his personal account the sum of $750.00 for that purpose."

The money was paid to the defendant through a check of the water district in the sum of $750. The check is an exhibit in this case. It named as its payee the defendant Cahill. No word, such as "secretary," "commissioner," "trustee," or "agent," indicating payment in a restricted capacity, was inserted in the check after the defendant's name. The day after he received the check, the defendant deposited it in the joint bank account of himself and his wife. At the end of the month the cancelled check was returned by the bank to the water district with a perforation which read: "Paid 6-12-51." Accordingly, at the end of the month, when the district received from the bank its cancelled checks and also the customary statement listing deposits and withdrawals, it noticed that the $750 had been paid to the defendant.

We now return to the meeting of June 8, 1951. The defendant, as I have said, received no remuneration for his services as a commissioner and secretary of the

board. When, during the course of the meeting, mention
was made that the district needed pipe, the defendant
had a two-fold interest in the subject. Others who have
served upon boards alike to the one which met on
June 8, 1951, have found themselves in a situation
similar to the one with which the defendant dealt; that
is, as a member of the board, the individual can do
nothing more concerning some matter upon which ac-
tion is desired than any other member of the board,
but, as a veteran, or as a member of the board of di-
rectors of a bank or in some other capacity, he can
procure the desired result. In the present instance,
the defendant, upon discovering that the district needed
pipe, stated that if the announcement which he had
read was correct he believed that he could, as a dis-
abled veteran, get some pipe. The members of the
board surely realized that, as a commissioner, the
defendant could do nothing which each of them and the
board's purchasing agent (the superintendent) could
not do as well, but, as a disabled veteran, he had su-
perior access to the pipe. Therefore, when his fellow
commissioners requested him to buy some of the gov-
ernment's pipe, they did not want him to make the pur-
chase as a water commissioner nor in the board's name,
but in his own name and in his capacity as a disabled
veteran. Of course, they expected him, after receiving
the pipe, to transfer it to the water district without
profit to himself. Thus, it is manifest that the money
was given to the defendant, not as a commissioner nor
as secretary of the board, but in his individual capacity.
By reverting to the resolution which was adopted that
evening, it will be seen that it directs that the money
should be transferred to the defendant's ''personal
account.'' We note from the foregoing that the board
had a definite purpose in inserting the words ''per-

sonal account'' in the resolution. They were important to the board's plan. It wanted the defendant to deal with the money and with the pipe in his personal capacity. To fail now to give those words effect is tantamount to changing the nature of the transaction ex post facto.

The nature of the transaction which occurred in the board meeting of June, 1951, was by no means strange. The record indicates that when the resolution was passed, the defendant was popular and well liked throughout the area. He had the confidence of his fellow commissioners. While with the armed forces he was engaged in some phase of engineering and upon returning after his discharge he placed his engineering experience to the avail of one of the local municipalities, thereby adding to his prestige. Thus, when the money was handed to him it was given to an individual who was well regarded. A year or more later he became involved in some controversial activities which cost him some of his friends, and to those activities he attributes his troubles. I am not concerned with those involvements and have mentioned the good will which was manifested for him at the time of the transaction only for the purpose of indicating that the board's action was reasonable.

As a disabled veteran, the defendant was not an agent or fiduciary of the water district. By including in the resolution the words ''personal account'' the board negatived any imputation that it had in mind a trust relationship or that the money was to become a trust res. The board looked forward to the day when the defendant would convey to it pipe of the value of at least $750, and, in order to enable him to get the pipe, made an advance payment to him of $750. Since the money was paid to him in his individual capacity, it

was not given to him as a trust fund. The payment to him of the $750 created a debtor-creditor relationship, not a trustee-beneficiary relationship. It is fair to believe that the board thought that the defendant could be trusted to convey to the water district pipe of the value of $750, or, in the absence of ability upon his part to do so, to repay the money.

Section 12, Restatement of the Law, Trusts, says:

"A debt is not a trust."

Subdivision g declares:

"If one person pays money to another, it depends upon the manifested intention of the parties whether a trust or a debt is created. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created. If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created."

From Bogert on Trusts, § 15, the following is taken:

"An agent may acquire property by the expenditure of his own money under a contract with the principal, made as a part of the agency arrangement, that the agent will deal with the property as the principal may direct. Or the principal may transfer property interests directly to the agent under a similar contractual understanding. In both cases the agent has 'title,' that is, a broad general property interest, and he holds it subject to contractual duties in favor of his principal, enforceable in a court of law. No express trust is intended and no reason is seen why any implied trust should be presumed to arise. It is believed that such cases of agents holding general property, in specific things, subject to merely contractual duties toward their principals, are not uncommon.

\* \* \* \* \*

"Frequently the agent has delivered to him money or other personalty which is to become his absolute property, in consideration of which he agrees to pay out money from his own funds later on behalf of the principal. There can be no tendency to treat an agent who receives such personalty as a trustee. He takes complete title subject merely to a contractual duty."

I am satisfied that the money was paid to the defendant in his individual capacity and that no relationship resulted from the transaction except one of debtor-creditor.

Still further indicative of a debtor-creditor relationship, and not one of trustee-beneficiary, is the fact that the defendant had no authority whatever to purchase any pipe for the district even after the resolution of June 8, 1951, was adopted. That resolution read:

"By unanimous consent the amount of $750.00 was authorized to be transferred to the personal account of the Secretary for the purchase of material and equipment in the event inspection of such items determines that the district will benefit from such purchase."

Mr. F. H. Baxter had been a member of the water board since 1951 and in 1953 became its chairman. He testified:

"Q In the last analysis, Mr. Baxter, the superintendent and the clerk would do all the purchasing?

"A I don't get you.

"Q I say, in the last analysis, the superintendent of the board and the clerk of the board would do the purchasing for the board—isn't that correct?

"A They are authorized to make purchases. That is, small purchases. Any large purchase, of course, would come before the board.

"Q The entire board? But it would have to be inspected by the superintendent, wouldn't it, before — —

"A He inspects the material that comes to the board, yes, sir."

It is seen from the resolution that it conferred upon the defendant no power to purchase any pipe on behalf of the district. And the testimony of Mr. Baxter, who was a witness for the state, renders it clear that none of the commissioners possessed power to purchase anything for the district. Had the defendant purchased any pipe, he would have done so as an individual. If he purchased pipe which the district's officials, upon inspection, accepted, he would, of course, have conveyed the pipe to the district and thereupon the $750 debt would have been discharged. But if he had made a purchase which the district refused to accept he would have been powerless to have forced the acceptance of the pipe. The reason for his plight would have resulted from the fact that the district had not conferred power upon him to purchase anything. Without carrying the analysis further, it suffices to state that, normally, a trustee is not subject to such limitations. The essence of the matter is, as already indicated, that the pipe transaction contemplated that the defendant, as a disabled veteran, would seek to find material which the superintendent of the water district approved as suitable for the district's needs. Thereupon the defendant, after gaining the needed approval, would make the purchase in his own name, and upon receiving the pipe would deliver it to the district.

Still another circumstance which indicates that the defendant was not a trustee is the fact that the state claims that the water district made a peremptory de-

mand for the return of the purported trust res and in that way terminated the relationship. Trust relationships cannot be ended in that manner. Restatement of the Law, Trusts, § 330, reads:

"(1) The settlor has power to revoke the trust if and to the extent that by the terms of the trust he reserved such a power.

"(2) Except as stated in §§ 332 and 333, the settlor cannot revoke the trust if by the terms of the trust he did not reserve a power of revocation."

The manner in which it is claimed that the relationship was brought to a close proves that no trust relationship existed between the parties. The relationship was that of debtor and creditor.

Now let us see how the instructions which were given to the jury dealt with the subject just reviewed. It must be apparent that whether the defendant became a trustee when he received the $750 or became a debtor is of paramount importance. Unless he was a trustee, the charge must fail. If that issue was never submitted to the jury, then, clearly, the defendant has never had a trial by jury upon it. His plea of not guilty demanded that the issue should be submitted to the jury. The instructions to the jury said nothing whatever about a debtor-creditor relationship. The words "debtor" and "creditor" are wholly absent from the instructions. Not even an intimation was made to the jury that it was possible, when the defendant received the $750, he became a debtor. Unless the jurors were wiser than the instructions, they did not know that they could find that his receipt of that money made him a debtor. Not a hint was given to them as to how they could distinguish the one relationship from the other. No rule, formula or yardstick was mentioned whereby the jury could determine whether the payment to the

defendant created a trust, debt or something else. Of course, the instructions told the jury that if under the evidence ''you believe beyond a reasonable doubt that the defendant is guilty, it is your duty under your oath to bring in a verdict of guilty.'' Obviously, a jury needs more help than is afforded by the words just quoted. In determining whether or not the defendant, upon receiving the money, became a trustee or a debtor, the jury surely needed the help of a definition or criterion. The majority, in analyzing the situation, have resorted to the law books and it, therefore, is sensible to infer that the jury was not better informed than the man on the bench. Possibly it will be said that the following instruction filled the need:

> ''If you find from the evidence beyond a reasonable doubt that the defendant in Lincoln County, Oregon, at the time alleged in the indictment did have in his possession and under his control a certain sum of money belonging to the Taft-Nelscott-Delake Water District * * * that the defendant did convert to his own use the sum * * *.''

But that instruction, like the others, failed to give the jury any rule whereby it could determine whether or not the $750 belonged to the water district after it was paid to the defendant, or whether the defendant became owner of the money subject to a debtor-creditor relationship.

The instructions told the jury:

> ''The defendant Otto W. Cahill has admitted that he received $750.00 money of the Taft-Nelscott-Delake Water District.
> ''The law of Oregon provides that a public official is required by law to pay over to a municipal corporation money belonging to the municipal corporation which is in the possession of such public

official at the termination of his official capacity as such public official.''

The defendant at no time "admitted that he received $750.00 money of the Taft-Nelscott-Delake Water District.'' I repeat, he never made such an admission. Toward the close of the trial, his attorney, addressing the trial judge, declared:

"If Your Honor please, I think—it will shorten the matter, and it is not very material anyhow— I think, I think the testimony on that deposit—the questions of whether or not that $750.00 check was deposited for a time, the testimony of the defendant was in error.''

Later he added: "We will admit that the money was deposited.'' Certainly those words were not an admission that the $750 ever became a trust fund or that the defendant possessed "$750 money of the Taft-Nelscott-Delake Water District.'' I return to the words of the quoted instruction which said: "The defendant Otto W. Cahill has admitted that he received $750.00 money of the Taft-Nelscott-Delake Water District.'' The preposition "of", according to Webster's New International Dictionary, 2d edition, has the following meaning: "* * * belonging to; * * *.'' Bouvier's Law Dictionary, 3rd revision, defines it as "belonging to.'' In *People v. Wolf,* 334 Ill 218, 165 NE 619, the indictment charged that the defendant "unlawfully, feloniously, wilfully and maliciously did set fire to and burn a certain barn of one Everett Steele.'' A stateute provided that in an indictment for arson "if the building was occupied, it shall be sufficient to allege the building to be the property of the owner, lessee or occupant thereof; * * *.'' The defendant argued that the indictment was defective inasmuch as it did

not allege, according to him, that the barn was the property of Steele. In overruling the contention, the court said:

> "One meaning of the word 'of', given in Webster's New International Dictionary, is 'belonging to'. The plain meaning of the words "a barn of one Everett Steele', is that it is a barn belonging to or the property of Everett Steele. This is the view that has been adopted in other jurisdictions where the question has arisen."

*Davis v. The State*, 38 Ohio St 505, was based upon an indictment for burglary in which it was charged that the defendant feloniously broke into "a certain dwelling house, to-wit, the infirmary of Morgan County * * *." The defendant claimed that the indictment did not charge ownership in Morgan county. The court ruled:

> "To this we cannot agree. Taking the language in its ordinary meaning, the word 'of', in this connection, is equivalent to 'the property of' or 'belonging to'."

The use of the preposition "of" in the instruction given in the case at bar was deliberate and not a slip of the tongue. The state requested the very instruction which I quoted, and it was given in the precise words of the state's request.

The meaning of the instruction given by the trial judge is manifest. Since it coupled the words "admitted he received $750.00 money of the * * * Water District" with the charge that it is the duty of a public official to pay back "money belonging to the municipal corporation which is in his possession * * * at the termination of his official capacity as such public official", the jury were clearly given to understand that the money belonged to the water district. That is

especially true inasmuch as the instructions did not tell the jury to determine whether or not the money was a trust fund, and gave the jury no criteria whatever whereby it could have resolved that issue had it been assigned to that body. Since the defendant did not claim that he paid the money to the water district upon the termination of his term as a commissioner, the instruction was tantamount to a directed verdict in favor of the state.

This dissent should not be concluded without mentioning that much is contained in the majority opinion which can create the erroneous impression that the defendant, by his conduct, virtually conceded that he received the money as a trust fund. A reading of the evidence will dispel any impression of that kind. When the defendant testified that he kept the money together after receiving it he did not thereby indicate that it constituted a trust fund. He was endeavoring to explain that he constantly was able to pay back the money in the event that he was unable to acquire pipe. His defense was repayment and, since the state had introduced in evidence the bank ledger sheets showing that the defendant's account rarely held $750, the defendant tried to show that he constantly had $750 cash on hand. As a witness, he testified more than once that when he received the money he was authorized to put it in his bank account if he so wished; he added, "I testified before the grand jury, in accordance with the minutes of the meeting, I was authorized to put it in my own account." When his testimony is fairly construed, no admission can be found in it that the defendant admitted that he received the money as a trust fund.

Without proceeding further with this phase of the case, I express my belief that the defendant did not

receive the $750 as a trust fund. In any event, the issue pertaining thereto should have been submitted to the jury. Error was committed when the trial judge gave the jury the instruction which I quoted and when he failed to give the jury any instructions whatever as to how they could determine whether the money was given to the defendant in a trust capacity or in a debtor-creditor relationship.

I now turn to another error which I believe the majority make. The defendant, as we have seen, denied that he received the $750 as a trust fund. He went on and swore that on January 21, 1954, he paid back the money. In substantiation of that defense, he produced a paper entitled "Receipt" and testified that the signature to it was that of John D. Naylor, treasurer of the water district. The paper acknowledged receipt from the defendant of the sum of $750 on January 21, 1954. If the signature was Mr. Naylor's, then the defendant's testimony that he repaid the money was corroborated. If repayment was made January 21, 1954, it was made well in advance of the day when the water district instituted the civil proceeding against the defendant, upon which the state relied to prove demand for repayment. The statute upon which this case is predicated (OCLA 23-525 as amended by Oregon Laws 1941, ch 371 [in present form ORS 165.015]) is quoted in part in the majority opinion, but the quotation omits the words of the statute which, I believe, governed the trial. The material words are:

"If any person shall receive any money whatever for this state, * * * or other municipality or public corporation * * * or shall neglect or refuse to pay over any portion thereof * * * when lawfully demanded so to do, such person shall be deemed guilty of larceny * * *."

The majority opinion omits from its quotation the words "when lawfully demanded so to do." Those words, in my opinion, were deemed the essence of the purported crime in the trial court.

The indictment charged that the crime was committed February 1, 1954. It also specified the time when the alleged offense was committed by using these words: "wilfully and feloniously fail and refuse to pay over said sum of money then lawfully demanded so to do by said Taft-Nelscott-Delake Water District." Thus the indictment identified in a two-fold manner the time of the alleged offense. One of the specifications was the day given in the indictment, that is, February 1, 1954. The other was the day when the defendant failed, upon demand, to pay back. The demand, so the indictment said, was made February 1, 1954. The state claims that on February 1, 1954, a verbal demand was made upon the defendant and that shortly afterward the water district filed against the defendant a civil proceeding for the $750, but now it develops, if the majority is right, that the crime did not occur on February 1, 1954, but two years and seven months prior thereto. And it did not consist of the alleged failure of the defendant to have repaid upon demand, but in his action in permitting his bank account to drop below $750. It can be demonstrated by resort to the words of the district attorney who prosecuted this case that the state contended during the trial that the crime was committed February 1, 1954, and not on July 3, 1951, when the defendant's bank account declined to a balance of less than $750. One of the state's requested instructions, as prepared by the district attorney, declared:

"Ladies and Gentlemen of the Jury, If you find from the evidence beyond a reasonable doubt that

the defendant in the County of Lincoln and State of Oregon at the time alleged in the indictment did have in his possession and under his control a certain sum of money belonging to the Taft-Nelscott-Delake Water District, and that the Taft-Nelscott-Delake Water Distict is a municipal corporation of Oregon, and that the defendant did convert to his own use the sum of $750.00  *   *   *."

I direct attention to the words "at the time alleged in the indictment." The words of the requested instruction went on to say that if the defendant committed the act by converting the money and "by failing or refusing to pay over the money when lawfully demanded so to do, you should return a verdict of guilty." Upon no occasion did the state claim that the crime was committed at any other time. It asked for no instruction that the time stated in the indictment was immaterial. In presenting its case to this court, the state has not asked to be relieved from the time indicated in the indictment. The requested instruction was given verbatim to the jury.

The indictment can be fairly construed to mean that the alleged conversion of the water district funds was committed by the defendant when, after the district's demand for repayment, he failed to repay the money. I believe that the state's requested instruction, from which I quoted in the above paragraph, was framed upon that understanding of the charge. ORS 132.560 represents the enactment in this state of the results of more than four centuries of enlightened effort. It states:

"The indictment must charge but one crime, and in one form only, except that:  *  *  *."

The exceptions are not material in this case. ORS

132.530 is supplementary to the provisions just quoted. It reads:

> "The indictment must be direct and certain as to the party charged, the crime charged, and the particular circumstances of the crime charged when such circumstances are necessary to constitute a complete crime."

But, notwithstanding those wholesome provisions of our laws and the fact that the district attorney requested the trial judge to charge that if that body found that the defendant "at the time alleged in the indictment" converted to his own use money of the water district, the majority find that the indictment in its single count charges many crimes. Thus they say:

> "* * * The indictment charged that defendant converted the fund to his own use and did also charge that he failed and refused to pay over the fund. * * * It follows that conviction would have been proper on the undisputed evidence reviewed above, showing, (1) deposit of the fund and its conversion piecemeal after July 3, 1951 the last day on which the fund remained intact in the bank account, and (2) proof that the fund was never withdrawn as such but was used up by the personal withdrawals from the account."

In construing the indictment in that manner, the prevailing opinion says that no motion was made in the trial court to require the state to elect whether it would stand on the conversion feature or on the failure to return the fund upon demand. The answer seems obvious. Plainly, no motion of that kind was made because the district attorney afforded the defendant no occasion to make such a motion. He elected to stand upon "the time alleged in the indictment." See *State v. Lee*, 202 Or 592, 276 P2d 946.

By treating (a) the time of the alleged offense as February 1, 1954 and not July 3, 1951, and (b) the nature of the charge as neglect to maintain a bank balance of $750 and not failure to pay upon demand, the majority alter the charge upon which the defendant was prosecuted in such a way that they hold that his entire defense was immaterial. They say that repayment is no defense to a charge of embezzlement and that, therefore, the errors which were committed at the cost of the defendant in connection with his defense of repayment did not prejudice him. In fact, without expressly so saying, they find that he had no valid defense whatever. He and his witnesses might as well have stayed at home. According to the majority, the defendant became guilty the moment his bank account retreated below $750. When that happened he had no defense. If that was his crime, it is remarkable that the state waited for two years and seven months before seeking his indictment. If the charge against him was predicated upon the condition of his bank balance on July 3, 1951, is it not extraordinary that the district attorney and the trial judge were unaware of that fact? If the guilt was established the moment the bank clerk produced the defendant's ledger sheet, the prosecution could have rested and objections would have been sustained to all of the evidence which the defendant thereafter presented. It is plain that no one who participated in the trial entertained the conception of the charge against the defendant upon which this court finds him guilty.

I am satisfied that the time of the alleged offense, both as stated in the indictment and as developed at the trial was February 1, 1954, and that the defendant is wronged by the treatment accorded the charge in the prevailing opinion.

If the prevailing opinion is justified in treating the case in the manner described above, it would have no occasion to resort to Art. VII, § 3, Constitution of Oregon, but it reaches out and embraces that provision. In so doing it deems inconsequential the errors which were committed (1) when, over the defendant's objections, the testimony of the three experts was received; (2) when, over the defendant's objections, the nine checks were received in evidence. Further, in affirming the conviction, it brushes aside as unimportant all of the following testimony which the defendant produced in his favor: (1) The defendant swore that on January 21, 1954, a few days prior to the death of John D. Naylor, treasurer of the water district, he handed to him in the Naylor home the sum of $750 and thereby discharged the obligation. (2) The defendant swore that he saw Mr. Naylor sign the challenged receipt and that the signature which the experts branded as a forgery was Mr. Naylor's genuine signature. (3) The defendant's wife swore that she accompanied the defendant in his automobile when on January 21, 1954, he drove to Mr. Naylor's house and that she noticed when he left the automobile to ascend the steps leading to the house he carried an envelope containing currency. She also swore that when he later returned to the car he no longer had the envelope but displayed a receipt which he placed in the glove compartment of the car. (4) Mrs. John D. Naylor, as a witness for the state, testified that in January, a few days prior to her husband's death, the defendant visited him in their home. (5) W. B. Borton, who had known Mr. Naylor "for a great number of years—I would say since 1933" and had had business transactions with him which brought to him checks signed by Mr. Naylor, swore that the signature upon the challenged receipt

was Mr. Naylor's. (6) L. E. Flutz, who (a) had known Mr. Naylor for many years, (b) had served with him monthly for three years on the board of trustees of a church, and (c) had seen Mr. Naylor many times sign his signature, swore that when he was shown the questioned document, "I am positive it was Mr. Naylor's signature."

If the defendant made repayment January 21, 1954, he did so before the purported demand was made upon him and therefore the charge contained in the indictment can not be sustained. I add that it is very doubtful whether any demand was ever made upon him for repayment. It is true that February 1, 1954, the chairman of the water district telephoned to the defendant, but the call was not a demand for repayment but for the files of correspondence concerning the $750. A few days after February 1, 1954, the attorney for the water district instituted a civil proceeding against the defendant, and it is claimed that that proceeding was the demand. The trial judge charged the jury:

> "You are instructed that the commencement of a civil action for the recovery of money is a lawful demand on the defendant to pay over money, if he has, to the plaintiff."

The pleadings in the civil action were not introduced in evidence, but the attorney for the water board who prepared the complaint, as a witness for the state, described the nature of the case in these words:

> "The action I brought, Mr. Hoy, was one for an accounting."

A suit for an accounting, obviously, is not a demand for the payment of money.

From the considerations above mentioned, it is seen that if this court is bound by the charge stated in the indictment and as construed by the district attorney,

the defendant presented a defense which this court is not at liberty to disregard. Nothing contained in Art. VII, § 3, Constitution of Oregon, justifies the course which the majority are taking.

For the apparent purpose of supporting their opinion, the majority say that the testimony which was given by Mr. Stanley MacDonald, one of the three handwriting experts who testified, indicates that the signature upon the receipt was a tracing. According to Mr. MacDonald, the questioned signature presented no indication of having been written by ''a flying pen.'' He called the jury's attention to the lack of ''a sharply pointed or tapered beginning stroke'' and commented upon the absence of ''a sharply pointed final stroke.'' Accordingly to his testimony, ''the pressure is constant throughout the entire signature and at the endings or terminals the ends are all blunt, which indicates that the pen in starting the signature rested on the paper before it started to move  *   *   *. Now that leaves a line of the same width throughout the questioned signature.''

The defendant swore that Mr. Naylor wrote the questioned signature with a ball-point pen. A ball-point pen would produce exactly the result described by Mr. MacDonald. At the point where it begins to impart ink to the paper a small blurb appears, thus accounting for a blunt beginning. If there is any doubt upon that subject, ''Aspects of Forensic Science, The Ball-Point Pen'' by Wilson R. Harrison, 1955 Criminal Law Review 544, will dispel the doubt. Although the defendant swore that Mr. Naylor used a ball-point pen, the district attorney asked Mr. MacDonald nothing concerning the characteristics of the writing which a pen of that kind produces. The undisputed evidence shows that on January 21, 1954, when he is said to have

signed the questioned receipt, Mr. Naylor was a very sick man. He died a few days later.

As the prevailing opinion points out, the three experts were permitted to compare the signature upon the receipt with ten other purported signatures of Mr. Naylor. Nine of those signatures, as the majority hold, would have been ruled admissible had ORS 42.070 been given effect. I agree with the majority that error was committed when the objections which the defendant made to the testimony of the experts were overruled. But the majority assume that the three experts would have given identically the same answers had they been permitted to see only the one signature of Naylor which the defendant conceded was genuine. I do not concur in that assumption. Albert S. Osborn, who is commonly regarded as the preeminent authority on questioned documents, states in his volume "The Problem of Proof", page 42:

> "The standards of comparison first provided in many disputed document cases are too few in number and not suitable in kind, and the finding of the suitable and adequate standards of comparison is one of the first steps to be taken in the preparation of a case of this kind."

The same volume, at page 52, adds:

> "What is especially desirable is that a sufficient quantity of writing and of succession of specimens of *the same matter* be secured as a means of testing disguise."

In his other treatise, "Questioned Documents", 2d edition, at page 27, Mr. Osborn says:

> "Several signatures should always be obtained, if possible, before any final decision is rendered, five signatures always constituting a more satisfactory basis for an opinion than one and ten being better than five."

Wigmore on Evidence, § 709, says:

"(b) There is, however, another consideration, also based on the present principle, i. e., that of the *adequacy* of the witness' sources of knowledge. The witness to the type of handwriting must have formed in his mind a standard based on the observation of specimens; and the inquiry must naturally be made (ante §§ 694-698) whether the specimens he has seen have been sufficient in number, in quality * * *. Now the same questions must come for settlement in dealing with the kind of witness, the expert. His sources of belief may be objected to (1) because the specimens laid before him are not sufficient in number, or (a) because they have been selected unfairly, for the purpose of aiding a peculiar view."

The reason why the expert should have at his disposal a number of genuine signatures when he makes his comparison and gives his opinion is because people rarely write their signatures exactly the same. A large number of genuine specimens is essential to acquaint the witness with the person's characteristic writing. Not only should the expert have many samples, but it is desirable that the signatures, admittedly genuine, should have been written upon paper and under circumstances substantially the same as the contested signature. It is altogether possible that if the expert witnesses had been shown only the single signature which was admissible in evidence they would have declared that it afforded an insufficient basis for saying whether the questioned signature was genuine or not.

There are other reasons which could be developed in this opinion, but I shall not go on. The above suffices. I am convinced that the majority opinion is unwarranted. The challenged judgment should be reversed.

TOOZE, J., dissenting.

I dissent from the majority opinion, but for one reason only. I cannot subscribe to the application of Art. VII, § 3, of the Oregon Constitution being made by the majority in its opinion.

The only affirmative defense offered by defendant in this case is that he repaid the money to the treasurer of the water district and obtained the treasurer's receipt for such repayment. He admitted that he had received the money. The state attacked the receipt as being a forged document, and the error committed on the trial, error that is conceded by the majority, related directly to this alleged forgery. It is manifest, therefore, that the evidence erroneously admitted against defendant touched the very gist of his defense. The improper admission of this evidence was not merely a technical defect in the proceedings as suggested in ORS 138.230. To say that error which goes directly to the very substance of the defense is not prejudicial goes much further than I am willing to go in this or any other case; it is presumed to be prejudicial. To say that it is not prejudicial requires a consideration and weighing of all the facts and circumstances of the case, and that evidently is what the majority has done. In a sense, at least, this court is re-trying the facts, and upon a theory of the case different from that presented by the state upon the trial.

As I understand the majority opinion, defendant's crime was complete when he deposited the $750 in his own personal banking account (the resolution turning the money over to him directed that that be done), and the balance in that account, because of withdrawals, was reduced below that sum. If that is true, then all the allegations of the indictment charging defendant with failing to repay the money on demand, which

would constitute larceny under the statute for an alleged violation of which defendant was prosecuted, became mere surplusage and not a necessary part of the crime charged in the indictment. I also am unwilling to subscribe to that theory because, as Justice ROSSMAN so ably demonstrates in his opinion, those allegations are essential elements of the particular crime charged, and it was necessary to prove them to warrant a conviction. Defendant was under a necessity of being prepared to defend against these. Repayment was such a defense. The state in offering its evidence on the trial recognized this necessity. It produced substantial evidence to prove those allegations. The point is, however, that the acknowledged error in this case, which the majority now says was not prejudicial, goes to the very heart of defendant's defense in answer to those averments. If the theory adopted by the majority in this case is correct, then it is manifest that defendant simply had no defense to the charge against him. He should have thrown up his hands and quit fighting the instant the indictment was returned. According to the theory of the majority, there really was nothing for the jury to pass upon; it had no alternative other than to find defendant guilty.

ORS 138.230 (adopted first in 1864), the statutory predecessor of the language to be found in Art. VII, § 3, Oregon Constitution, which is relied upon by the majority as its authority for affirming the judgment of conviction notwithstanding the error committed on the trial, provides:

"After hearing the appeal, the court [Supreme] shall give judgment, without regard to the decision of questions which were in the discretion of the court below or to technical errors, defects or exceptions which do not affect the substantial rights of the parties."

I do not think it was the intention of the people in adopting Art. VII, § 3 (the portion thereof involved here), to do other than reaffirm and give constitutional sanction to what had long been the statutory law of this state: ORS 138.230, supra. In my opinion, the constitutional provision has reference to the same conditions mentioned in the statute: matters of discretion on the part of the trial court, *technical* errors, defects, or exceptions. The error in the instant case was neither technical nor a matter involving the exercise of judicial discretion.

Although the construction of Art. VII, § 3, as a whole is not involved here, there is involved the question of what is intended by the clause thereof now being used by the majority. In view of that fact, I cannot overlook this opportunity of expressing my own view that the whole question of what is intended by Art. VII, § 3, should be re-examined upon a proper occasion. In my opinion, *Hoag v. Washington-Oregon Corp.,* 75 Or 588, 144 P 574, 147 P 756, gives an erroneous interpretation to this constitutional provision adopted by the people in 1910. I believe the true interpretation is to be found in the dissenting opinions in that case of former Justices GEORGE H. BURNETT and LAWRENCE T. HARRIS. I do not think the people of this state intended that this court should in actions at law, both civil and criminal, ever re-try, either directly or indirectly, the facts presented to a jury. The first sentence of Art. VII, § 3, expressly denies us that right. In particular, I recoil from the use that is being and has been made of Art. VII, § 3, in cases involving the life or liberty of any person.

The judgment should be reversed and the cause remanded for a new trial.

On Petition for Rehearing

*Harry G. Hoy,* of Oceanlake, argued the cause for appellant. With him on the brief was B. Richard Anderson, of Newport.

*William T. Hollen,* Special Deputy District Attorney, of Newport, argued the cause for respondent. With him on the brief were Robert Y. Thornton, Attorney General for Oregon, Walter W. Foster, District Attorney, of Dallas, and T. R. Adams, Special Deputy District Attorney, of Taft.

PER CURIAM.

The former opinion and judgment affirming the conviction of the defendant is adhered to.

Justice Rossman adheres to his former dissent.

Justice Tooze adheres to his former dissent.